849 A.2d 46

Luella D. CHRISTOPHER

v.

**MONTGOMERY COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES.**

No. 103, Sept. Term, 2003.

Court of Appeals of Maryland.

May 12, 2004.

192

Donald E. English, Jr. (Morgan, Lewis & Bockius, L.L.P., Washington, DC; Gregory S. Lewis of Morgan, Lewis & Bockius, L.L.P., McLean, VA, on brief), for Appellant.

Steven D. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, Baltimore, on brief), for Appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, Judge.

This case requires us to consider whether a food stamp recipient must be receiving disability benefits in order to be entitled to an "uncapped" "excess shelter cost deduction" under the Maryland Food Stamp Program. Determining that "receives" means "actual receipt," we conclude that the decision of the Administrative Law Judge (hereinafter the "ALJ") that the appellant must actually be receiving disability benefits to be entitled to the uncapped excess shelter cost deduction was correct, and we affirm the judgment of the Circuit Court for Montgomery County, which had affirmed the ALJ's decision.

## I. Background

### A. Facts

Luella Christopher, the appellant, worked for the Library of Congress as a foreign affairs analyst until she was terminated on December 23, 1994 "for reasons of disability." Christopher has challenged the Library of Congress' determination, maintaining that she is not disabled and that she should be

reinstated to her former position. Christopher has not received any disability benefits and alleges that her appeal of her termination has prevented her from recovering such benefits.

Christopher took a part-time job with General Nutrition Centers and, in 1995, also began receiving food stamps for "an assistance unit of one person." When Christopher first applied for food stamps with the Montgomery County Department of Health and Human Social Services (hereinafter the "Department"), she received an "uncapped excess shelter cost deduction" of $1000.98, which, when combined with her average monthly earned income of $713.93, qualified her for food stamps.[1]

In April 2002, the Department determined that Christopher was eligible to continue to receive food stamps, and approved her for $135 per month for a six month period. On May 18, 2002, the Department sent Christopher a notice informing her that it had changed her food stamp payment to $110, explaining that the $135 amount was incorrect because Christopher was "erroneously receiving an uncapped shelter deduction based upon disability." In its notice to Christopher, the Department stated that, in order to receive the uncapped shelter cost deduction, food stamp recipients must either be at least 60 years old or be receiving disability benefits. Christopher was 57 at the time and was not receiving disability benefits.

Arbitration proceedings are still pending to resolve whether Christopher was properly terminated based on her alleged disability. Christopher continues to work at General Nutri-

---

1. As we explain in more detail *infra*, the "excess shelter cost deduction" allows applicants to subtract from their gross income a limited or "capped" amount of allowable shelter costs, which include, *inter alia*, heating and cooking fuel, electricity, and water expenses adding up to more than half of the household's income. 7 U.S.C.A. § 2014(e)(6)(A) (West Supp.2003). The amount of the excess shelter cost deduction is "capped" for most food stamp applicants. Elderly or disabled households, however, are eligible for an unlimited or "uncapped" deduction, which allows them to subtract all of their "excess shelter costs" from their gross income. 7 U.S.C.A. § 2014(e)(6)(B).

tion Centers on a part-time basis. She does not consider herself disabled and has not received any form of disability income or pension since she first challenged the Library of Congress' determination to terminate her employment. If she is unsuccessful at arbitration, she claims she would be entitled to no less than $1,346 per month in disability benefits based on a general "statement of benefits" she received from the Library of Congress before she was terminated.[2]

## B. Procedural History

On August 6, 2002, Christopher requested an administrative hearing regarding the Department's decision to reduce her food stamp allotment, contending that the Department's determination "countermand[ed] the spirit of the law which is to provide certain benefits such as the uncapped shelter deduction to disabled individuals instead of denying [the] same on a technicality." A hearing was held on September 24, 2002 before Administrative Law Judge Eleanor Wilkinson, who heard testimony from Christopher and a representative from the Department.

ALJ Wilkinson concluded that the Department correctly reduced Christopher's allotment when it determined that she was not eligible for the uncapped shelter deduction. Under COMAR 07.03.07.43I(3),[3] the ALJ explained, a food stamp recipient is entitled to the uncapped shelter cost deduction if he or she is at least 60 years old or disabled. The ALJ then

---

2. The section Christopher cites from her "Statement of Benefits," titled "Disability Retirement," reads:

> If you have 5 or more years of Federal civilian service and become totally disabled, your monthly pension under CSRS would be about $1,346 starting when you separate from service or your pay status terminates, and continues as long as you remain disabled and unable to work, even for life.

3. COMAR 07.03.17.43, Calculation of Household Food Stamp Net Monthly Income, provides how local departments must compute a food stamp applicant's net monthly income. Section I(3) of the provision states: "If the household contains an elderly or disabled member as described in Regulation .02B of this chapter, the total amount of the excess shelter cost is subtracted."

pointed out that "disabled is defined by COMAR 07.03.07.02B(6)," which defines disabled as an individual who "receives" or "is receiving" Supplemental Security Income benefits, federal or state disability benefits under the Social Security Act, disability retirement benefits, interim assistance benefits pending receipt of Supplemental Security Income, or disability-related federal medical assistance.[4] Because Christopher was not receiving any of the disability benefits required by the definition of disabled found in COMAR 07.03.07.02B(6), ALJ Wilkinson concluded that Christopher was not entitled to the uncapped shelter cost deduction: "There is simply no provision under governing regulations that permits an individual who is not receiving some form of disability benefit to qualify as disabled and receive the uncapped shelter deduction."

Christopher filed a timely petition for judicial review in the Circuit Court for Montgomery County, alleging that the Department improperly reduced her food stamp benefits. On June 9, 2003, the Circuit Court affirmed the ALJ's decision. Observing that Christopher "admitted she did not qualify as an individual entitled to benefits as illustrated in [COMAR] 07.03.07.02B(6)," the court determined that the ALJ properly ruled that Christopher cannot be considered "disabled" for the purposes of receiving the uncapped excess shelter cost deduction.

---

4. COMAR 07.03.17.02B(6) defines "disabled" as an individual who:

(a) Receives Supplemental Security Income benefits or other federal or State-administered payments when eligibility to receive the benefits is based upon the disability or blindness criteria of the Social Security Act;

\* \* \*

(f) Is receiving a disability retirement benefit from a government agency because of a disability considered permanent under the Social Security Act;

\* \* \*

(h) Is receiving interim assistance benefits pending receipt of Supplemental Security Income; or

(i) Is receiving disability-related federal medical assistance.

(The omitted sections refer to veterans or railroad retirees.)

Christopher noted an appeal to the Court of Special Appeals, and this Court issued, on its own initiative, a writ of certiorari, *Christopher v. Dept. of Health,* 379 Md. 98, 839 A.2d 741 (2004), prior to any proceedings in the intermediate appellate court. Christopher presents the following questions for our review:

1. Whether [the Department's] decision that COMAR 07.03.17.43I(3)—which permits an uncapped shelter deduction for individuals "receiving" federal disability benefits— precludes an uncapped deduction for [Christopher], who was deemed eligible to receive federal disability benefits but has not actually received them because the disability determination is under appeal, is arbitrary and capricious because it penalizes an individual for exercising her right to appeal and arbitrarily distinguishes between individuals who are eligible to receive disability benefits based on whether they appeal their disability determinations.

2. Whether [the Department's] denial of an uncapped deduction to [Christopher] under COMAR 07.03.17.43I(3) deprives her of equal protection under the 14th Amendment to the U.S. Constitution and Article 24 of the Maryland Declaration of Rights because there is no rational basis for distinguishing among individuals determined to be entitled to disability benefits based on whether they appeal their disability determinations.

We conclude that the ALJ's decision was correct and affirm the judgment of the Circuit Court for Montgomery County.

## II. Standard of Review

■ We observe at the outset that Christopher conflates two different standards of review when she contends that the Department "erred as a matter of law" because "its interpretation of COMAR 07.03.17.43I(3) and COMAR 07.03.17.02B(6) is arbitrary and capricious" as it penalizes her "for exercising her legal right to appeal her disability determination." As we shall explain, the statutory standards allowing reviewing courts to reverse or modify agency decisions are different depending upon the agency's action. *See Spencer v. Mary-*

*land State Bd. of Pharmacy,* 380 Md. 515, 527–29, 846 A.2d 341, 348–49, 2004 WL 439310, at *6 (2004). Contrary to Christopher's contention, if the Department "erred as a matter of law," the question is not whether the Department abused its discretion by acting "arbitrarily and capriciously," but whether the agency interpreted and applied the law correctly.

■ Our review of administrative agency decisions made by the Montgomery County Department of Health and Human Services, which administers state social services for Montgomery County, is governed by Section 10–203(d) of the Administrative Procedure Act (hereinafter the "APA").[5] Maryland Code, § 10–203(d) of the State Government Article (1984, 1999 Repl. Vol.). When we consider an administrative agency decision, we review the agency's decision applying the same statutory standards as used by the preceding reviewing court. *Spencer,* 380 Md. 515, 523–25, 846 A.2d 341, 345–47, 2004 WL 439310, at *4; *Watkins v. Dept. of Public Safety and Corr. Services,* 377 Md. 34, 46, 831 A.2d 1079, 1086 (2003); *Maryland Div. of Labor and Industry v. Triangle General Contractors, Inc.,* 366 Md. 407, 416, 784 A.2d 534, 539 (2001); *Gigeous v. Eastern Correctional Inst.,* 363 Md. 481, 495–96, 769 A.2d 912, 921 (2001) (citing *Public Serv. Com'n v. Baltimore Gas & Elec. Co.,* 273 Md. 357, 362, 329 A.2d 691, 694–95 (1974)).

The statutory standards allowing reviewing courts to reverse or modify agency decisions are found in Section 10–222(h)(3) of the APA. Under the provision, agency decisions may be reversed or modified if the court concludes that an agency finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

---

5. Maryland Code, Art. 88A, § 13A(b)(1) (1957, 2003 Repl. Vol.) provides:

> In Montgomery County, there is no local department of social services. In Montgomery County, State social service and public assistance programs administered by a local department shall be administered by the Montgomery County government.

 (iii) results from an unlawful procedure;

 (iv) is affected by any other error of law;

 (v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

 (vi) is arbitrary or capricious.

As we explained in *Spencer*, 380 Md. 515, 527–29, 846 A.2d 341, 348–49, 2004 WL 439310, at *6, the six standards may be grouped into three categories: conclusions of law, findings of fact, or discretionary action. *See also Department of Health and Mental Hygiene v. Campbell*, 364 Md. 108, 118, 771 A.2d 1051, 1057 (2001)(explaining that "the issue for the reviewing court is whether the administrative agency committed an error of law, or whether its decision is supported by substantial evidence, or is 'arbitrary or capricious' "). The first four standards apply when an agency makes a "conclusion of law." The fifth standard applies when an agency makes a finding of fact. The sixth standard applies when an agency acts in its "discretionary capacity." *Spencer*, 380 Md. 515, 527–29, 846 A.2d 341, 348–49, 2004 WL 439310, at *6; *see also Maryland Transp. Authority v. King*, 369 Md. 274, 799 A.2d 1246 (2002) (discussing the arbitrary and capricious standard). The tests differ for each category.

 Determining whether an agency's "conclusions of law" are correct is always, on judicial review, the court's prerogative, although we ordinarily respect the agency's expertise and give weight to its interpretation of a statute that it administers. *Watkins*, 377 Md. at 46, 831 A.2d at 1086 (quoting *Baltimore Lutheran High School v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985)); *see also Total Audio–Visual Sys., Inc. v. Dept. of Labor*, 360 Md. 387, 394, 758 A.2d 124, 127–28 (2000). Of course, even though an agency's interpretation of a statute is often persuasive, "the reviewing court must apply the law as it understands it to be." *Supervisor of Assessments of Baltimore City v. Chase Assocs.*, 306 Md. 568, 574, 510 A.2d 568, 571 (1986). Nevertheless, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Board of*

*Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376, 381 (1999).

 With respect to an agency's findings of fact, a reviewing court applies the substantial evidence test, determining "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Id.* at 68, 729 A.2d at 380 (quoting *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978)). Again, the reviewing court generally defers to the agency, appraising its fact-finding and subsequent inferences from that fact-finding, if supported by the record, in a light most favorable to the agency. *Id.* at 68, 729 A.2d at 381 (citing *CBS v. Comptroller,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990)).

 Finally, the court applies the arbitrary and capricious standard when it reviews an agency's discretionary functions. As we observed in *Spencer,* when an agency acts in its discretionary capacity, it is taking actions that are specific to its mandate and expertise and, unlike conclusions of law or findings of fact, have a non-judicial nature. For this reason, we "owe a higher level of deference to functions specifically committed to the agency's discretion." *Spencer,* 380 Md. 515, 529–31, 846 A.2d 341, 349–50, 2004 WL 439310, at *7. "[A]s long as an administrative agency's exercise of discretion does not violate regulations, statutes, common law principles, due process and other constitutional requirements, it is ordinarily unreviewable by the courts." *Maryland State Police v. Zeigler,* 330 Md. 540, 557, 625 A.2d 914, 922 (1993). Courts thus generally only intervene when an agency exercises its discretion "arbitrarily" or "capriciously." *Id.* at 558, 625 A.2d at 922.

### III. Discussion

The basis of Christopher's argument rests on her assumption that, had she not appealed the Library of Congress's termination of her employment "for reasons of disability," she would be eligible to receive disability benefits and, consequently, would be deemed "disabled" for the purposes of receiving the entire or "uncapped" excess shelter cost deduction as

opposed to the limited or "capped" deduction. We shall assume, for the sake of this discussion, that the fact-finder had a basis for concluding that Christopher, indeed, would have been entitled to disability benefits had she not taken her appeal.

Claiming, thus, that she forfeited disability benefits she would have received otherwise in order to appeal her employer's termination decision, Christopher goes on to maintain that the Department "erred as a matter of law" for two reasons when it denied her the "uncapped" excess shelter cost deduction. According to Christopher, the Department's "interpretation of COMAR 07.03.17.43I(3) and 07.03.17.02B(6) is arbitrary and capricious ... because it penalizes Christopher for exercising her legal right to appeal her disability determination .... [and] impermissibly distinguishes between individuals who have been determined to be disabled based on whether the individual has appealed that decision...." Christopher thus urges that she should be "deemed to be constructively receiving disability benefits" under the relevant COMAR regulations. Furthermore, in Christopher's view, "constructive receipt means that [she] is 'receiving' benefits for purposes of the statute and regulation, but the *amount* of the benefits actually received is zero due to [her appeal of the Library of Congress' disability determination]."

Christopher also contends that the Department deprived "her of equal protection of the laws under both the Equal Protection Clause of the 14th Amendment to the U.S. Constitution and Article 24 of the Maryland Declaration of Rights because a distinction between individuals who have been determined to be disabled, based on whether the individual has appealed that decision, is not rationally related to any legitimate government interest." She maintains that "there is no rational government interest inherent in placing an individual who has been determined to be disabled, and therefore lost job and compensation, in a position of where that individual must forego the right to appeal that determination or otherwise receive lower food stamp assistance than other disabled

individuals who choose not to appeal their disability determinations."

The State argues that the ALJ correctly found that Christopher was not entitled to the uncapped excess shelter cost deduction because she is not "disabled" as defined by state and federal law. According to the State, under COMAR 07.03.17.02B(6), the definition of disabled for the purposes of the uncapped excess shelter cost deduction turns on whether the individual actually receives a disability benefit. Moreover, in the State's view, there is no "catch-all definition of 'disabled' that would permit an individual who receives no type of compensation for a disability but whom an employer has terminated on the basis of a disability to be considered a 'disabled' household member." Because the ALJ "adhered to the plain meaning of the words defining disabled," the State maintains that the ALJ cannot be considered to have acted arbitrarily or capriciously.

The State also contests Christopher's argument that, by appealing her termination from the Library of Congress, she receives a smaller food stamp benefit than if she had declined to appeal. The State disputes Christopher's claim that she is constructively entitled to "zero" benefits while her employment matter is on appeal. It argues instead that, if Christopher were to be awarded disability benefits of $1,346 per month, and if she were to receive such, the benefits would count as income "which would have only been partially offset by the uncapped shelter deduction." As such, according the State, the amount of food stamps Christopher would be entitled to receive would decrease to approximately $71.00 per month. The State thus rejects Christopher's argument that she is penalized for appealing her disability determination.

Finally, the State maintains that the equal protection guarantees under Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment to the United States Constitution are not violated by the requirement that individuals receive disability benefits in order to be .considered disabled for the purposes of the uncapped excess shelter cost deduc-

tion. The definition of "disabled" required for the uncapped excess shelter cost deduction, in the State's view, is rationally related to the legitimate government interest in treating those who receive disability income differently than those who do not for the purpose of calculating food stamp benefits. As the State explains it, because additional income ordinarily reduces an individual's food stamp allotment, the uncapped excess shelter cost deduction is a means of "offsetting" or "mitigat[ing] the negative effect of that income" when the income is disability benefits.

### A. The ALJ's Decision

#### 1. The Food Stamp Program

The Food Stamp Act, 7 U.S.C. §§ 2011, *et. seq.*, is a state administered program funded by the federal government to provide low-income individuals with "an opportunity to obtain a more nutritious diet." 7 U.S.C.A. § 2013(a) (West 1999); *see West v. Bowen,* 879 F.2d 1122, 1124 (3d Cir.1989). "The Secretary of Agriculture prescribes the standards for eligibility for food stamps, but state agencies are authorized to make individual eligibility determinations and to distribute the food stamps to eligible households, which may use them to purchase food from approved, retail food stores." *Atkins v. Parker,* 472 U.S. 115, 117, 105 S.Ct. 2520, 2523, 86 L.Ed.2d 81, 85 (1985) (footnote omitted); *see* 7 U.S.C.A. § 2014(b) (West Supp.2003). In order to participate in the Food Stamp Program, states must comply with the Food Stamp Act and the Secretary's regulations. 7 U.S.C.A. §§ 2020(a), 2025 (West 1999). Maryland law requires the Department to implement the program in conformity with federal and state law and regulations. Maryland Code, Art. 88A, § 13A(e) (1957, 2003 Repl. Vol.)(stating that "the administration of State programs by Montgomery County shall ... be governed by State and federal regulations").[6]

---

6. The Department of Human Resources (hereinafter "DHR") administers Maryland's Food Stamp Program. Maryland Code, Art. 88A, § 15 (1957, 2003 Repl. Vol.). Section 13 of Article 88A requires DHR to

■ Eligibility for food stamps is largely determined by a household's income. Section 2014(a) of the Food Stamp Act provides: "Participation in the food stamp program shall be limited to those households whose incomes and other financial resources, held singly or in joint ownership, are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet." *See also Knebel v. Hein,* 429 U.S. 288, 289, 97 S.Ct. 549, 551, 50 L.Ed.2d 485, 488 (1977). As a general rule, the recipient's food stamp allotment decreases when his or her income increases. *See West,* 879 F.2d at 1124. Although "[h]ousehold income for purposes of the food stamp program shall include *all income from whatever source," see* 7 U.S.C.A. § 2014(d) (West Supp.2003)(emphasis added), certain exclusions (regarding incoming revenue) and deductions (regarding expenses) apply. For example, federal energy assistance payments may be "excluded" from the income calculation. *See West v. Sullivan,* 973 F.2d 179, 181 (3d Cir.1992). Benefits, such as social security disability benefits, are not "excluded" under the program, however, and thus ordinarily constitute income.[7] *See Stevens v. Jackson,* 800 F.Supp. 344, 345 (W.D.Va.1992)(explaining how a household's food stamp allotment was reduced because the household received social security disability benefits).

In addition to excluding certain incoming revenue from the applicant's total income calculation, certain deductions also apply. 7 U.S.C.A. § 2014(e). Deductions serve to account for

create local departments of social services in each county, except for Montgomery County, and Baltimore City in order to administer the program on a local level. Pursuant to Section 13A of Article 88A, Montgomery County, where Christopher resides, administers the program instead of a local department of social services.

7. Because benefits increasing a recipient's household income may not be offset by other factors, the benefits may actually reduce the recipient's food stamp allotment. *Id.; see also* 2A SOCIAL SECURITY: LAW AND PRACTICE § 34:75 (2003). Ultimately, as shall become more apparent *infra,* Christopher has argued she is entitled to "zero" benefits because she wants to receive the benefit of a deduction without suffering the consequences of the corresponding increase in income, which would decrease her total food stamp allotment.

many of the applicant's necessary expenses, *see Knebel,* 429 U.S. at 296, 97 S.Ct. at 554, 50 L.Ed.2d at 492, thus reducing the applicant's total income calculation and increasing the amount of food stamps for which his or her household is eligible. Some of the allowable deductions include child care expenses, medical expenses, and "excess shelter costs." 7 U.S.C.A. § 2014(e).

COMAR 07.03.17.43 outlines how "net monthly income" is to be calculated in Maryland pursuant to federal law.[8] Under the regulation, net income is the applicant's gross income minus certain deductions.

---

**8.** COMAR 07.03.17.43, *Calculation of Household Food Stamp Net Monthly Income,* provides:

The local department shall compute net monthly income in the following manner:

A. Compute gross monthly income;

B. Subtract from the gross self-employment income the amount allowed by Regulation .39B and C of this chapter;

C. Subtract an earned income deduction of 20 percent of gross monthly earned income;

D. Subtract a standard deduction in the amount stated in Schedule E of Regulation .45 of this chapter;

E. Subtract that portion of medical expenses as defined in Regulation .33 of this chapter in excess of $35 per month incurred by a household member who is elderly or disabled as described in Regulation .02B of this chapter;

F. Subtract payments for the actual cost paid by the household to someone outside the household for the care of a child or other dependent as described in Regulation .34 of this chapter not to exceed the maximums in Schedules J and K in Regulation .45 of this chapter;

G. Subtract payments for child support for an individual living outside the home as set forth in Regulation .35 of this chapter;

H. Subtract a homeless shelter allowance as described in Regulation .36 of this chapter for homeless households in the amount stated in Schedule L in Regulation .45 of this chapter; and

I. Subtract any excess shelter cost as follows:

(1) Excess shelter cost is calculated as the amount of the shelter cost, as described in Regulation .37 of this chapter, which exceeds 50 percent of the amount of income remaining after the deductions in §§ A–H of this regulation are allowed,

(2) Subtract the excess shelter cost not to exceed the maximum in Schedule F of Regulation .45 of this chapter, and

(3) If the household contains an elderly or disabled member as described in Regulation .02B of this chapter, the total amount of the excess shelter cost is subtracted.

The deduction at issue here is the "excess shelter cost deduction," which allows applicants to subtract from their gross income a limited or "capped" amount of allowable excess shelter costs. 7 U.S.C.A. § 2014(e)(6)(A).[9] Allowable "excess shelter costs" include, *inter alia,* monthly utility costs such as heating and cooking fuel, electricity, and water adding up to more than half of the household's income. COMAR 07.03.17.43I; *see also* MARYLAND DEPARTMENT OF HUMAN RESOURCES FOOD STAMP MANUAL § 212.3 *available at* http://www.dhr.md.us/stamp/manual (last visited May 10, 2004). Although the amount of the excess shelter cost deduction is "capped" for most food stamp applicants at approximately $378,[10] elderly or disabled households are eligible for an unlimited or "uncapped" deduction, which allows them to subtract all of their "excess shelter costs" from their gross income. 7 U.S.C.A. § 2014(e)(6)(B).[11] Specifically, COMAR

---

9. Section 2014(e)(6)(A) of Title 7 of the U.S.Code provides:

 A household shall be entitled, with respect to expenses other than expenses paid on behalf of the household by a third party, to an excess shelter expense deduction to the extent that the monthly amount expended by a household for shelter exceeds an amount equal to 50 percent of monthly household income after all other applicable deductions have been allowed.

10. The Food and Nutrition Services of the United States Department of Agriculture provides examples of income calculations under the program and lists the current "cap" for the excess shelter cost deduction as $378. *See* "Fact Sheet on Resources, Income, and Benefits," *available at* http://www.fns.usda.gov/fsp/applicant—recipients/fs—Res—Ben—Elig.htm (last visited May 10, 2004).

11. Section 2014(e)(6)(B) of Title 7 of the United States Code provides:

 In the case of a household that does not contain an elderly or disabled individual, in the 48 contiguous States and the District of Columbia, Alaska, Hawaii, Guam, and the Virgin Islands of the United States, the excess shelter expense deduction shall not exceed—
 (i) for the period beginning on August 22, 1996, and ending on December 31, 1996, $247, $429, $353, $300, and $182 per month, respectively;
 (ii) for the period beginning on January 1, 1997, and ending on September 30, 1998, $250, $434, $357, $304, and $184 per month, respectively;

07.03.17.431(3), which is derived from 7 C.F.R. § 273.9(d)(6)(ii),[12] provides: "If the household contains an elderly or disabled member as described in Regulation .02B of this chapter, the total amount of the excess shelter cost is subtracted." In short, elderly and disabled applicants are eligible for the "uncapped" excess shelter cost deduction, which allows them to deduct all of their excess shelter expenses, while all other applicants are eligible only for a "capped" amount.

The consequence of this regulation is that elderly and disabled food stamp recipients receive a greater benefit under the excess shelter cost deduction than other applicants do because, by subtracting all of their allowable shelter costs from their gross income instead of just the limited, capped amount, their "net income" is reduced to a greater extent. *See Huberman v. Perales*, 884 F.2d 62, 64 (2d Cir.1989)(explaining how a disabled woman's food stamp allotment increased significantly because she was eligible for the uncapped shelter deduction instead of the capped one). Lower net

---

> (iii) for fiscal year 1999, $275, $478, $393, $334, and $203 per month, respectively;
> (iv) for fiscal year 2000, $280, $483, $398, $339, and $208 per month, respectively;
> (v) for fiscal year 2001, $340, $543, $458, $399, and $268 per month, respectively; and
> (vi) for fiscal year 2002 and each subsequent fiscal year, the applicable amount during the preceding fiscal year, as adjusted to reflect changes for the 12–month period ending the preceding November 30 in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the Department of Labor.

**12.** Section 273.9(d)(6)(ii) of Title 7 of the Code of Federal Regulations provides:

> Excess shelter deduction. Monthly shelter expenses in excess of 50 percent of the household's income after all other deductions in paragraphs (d)(1) through (d)(5) of this section have been allowed. If the household does not contain an elderly or disabled member, as defined in § 271.2 of this chapter, the shelter deduction cannot exceed the maximum shelter deduction limit established for the area. . . .

income, as we have noted, generally results in an increased food stamp allotment. *See* 7 U.S.C.A. § 2014.

In order to receive the uncapped excess shelter cost deduction, food stamp recipients must be 60 years of age or older or disabled. Section 2012(r)(2) of the Food Stamp Act defines a "disabled member" of a household eligible for food stamps in terms of someone who receives benefits. Under the provision, an "elderly or disabled member" includes someone who:

(A) receives supplemental security income benefits ... or

(B) receives Federally or State administered supplemental assistance ..., interim assistance pending receipt of supplemental security income, disability-related medical assistance ..., or disability-based State general assistance benefits ...;

(3) receives disability or blindness payments ... or receives disability retirement benefits from a governmental agency because of a disability considered permanent under section 221(i) of the Social Security Act (42 U.S.C. 421(i))....

Section 271.2 of Title 7 of the Code of Federal Regulations states that "elderly or disabled member" for the purposes of the Food Stamp Program includes a member of a household who:

(2) Receives supplemental security income benefits under title XVI of the Social Security Act or disability or blindness payments under titles I, II, X, XIV, or XVI of the Social Security Act;

(3) Receives federally or State-administered supplemental benefits under section 1616(a) of the Social Security Act provided that the eligibility to receive the benefits is based upon the disability or blindness criteria used under title XVI of the Social Security Act;

(4) Receives federally or State-administered supplemental benefits under section 212(a) of Pub.L. 93–66;

(5) Receives disability retirement benefits from a governmental agency because of a disability considered permanent under section 221(i) of the Social Security Act.

\* \* \*

(10) Receives an annuity payment under ... the Railroad Retirement Act ...

(11) Is a recipient of interim assistance benefits pending the receipt of Supplemented Security Income, a recipient of disability related medical assistance under title XIX of the Social Security Act, or a recipient of disability-based State general assistance benefits *provided* that the eligibility to receive any of these benefits is based upon disability or blindness criteria established by the State agency which are at least as stringent as those used under title XVI of the Social Security Act (as set forth at 20 CFR part 416, subpart I, Determining Disability and Blindness as defined in Title XVI).[13]

COMAR 07.03.17.02B(6) defines disabled similarly. In Maryland, a disabled person for the purposes of the Food Stamp Program is someone who:

(a) Receives Supplemental Security Income benefits or other federal or State-administered payments when eligibility to receive the benefits is based upon the disability or blindness criteria of the Social Security Act;

\* \* \*

(f) Is receiving a disability retirement benefit from a government agency because of a disability considered permanent under the Social Security Act;

(g) Is receiving a railroad retirement disability annuity ...;

(h) Is receiving interim assistance benefits pending receipt of Supplemental Security Income; or

(i) Is receiving disability-related federal medical assistance.[14]

In sum, for the purposes of the Food Stamp Program generally and the uncapped shelter cost deduction specifically, an individual is disabled if he or she receives certain disability benefits.

---

**13.** The omitted sections apply to veterans and their families.

**14.** The omitted sections apply to veterans and their families.

## 2. The ALJ's Conclusion of Law

In defining whether receiving disability means actual receipt in COMAR 07.03.17.02B(6), we begin the analysis by noting that the principles governing our interpretation of a statute apply when we interpret an agency rule or regulation. *Maryland Comm'n on Human Relations v. Bethlehem Steel Corp.*, 295 Md. 586, 592–93, 457 A.2d 1146, 1149–50 (1983); *Carriage Hill Cabin John, Inc. v. Maryland Health Resources Planning Comm'n*, 125 Md.App. 183, 248–249, 724 A.2d 745, 778 (1999). As we have said many times, a statute's plain language "is itself the best evidence of its own meaning." *Total Audio–Visual*, 360 Md. at 395, 758 A.2d at 128. "[W]hen the language is clear and unambiguous, our inquiry ordinarily ends there." *Drew v. First Guar. Mortgage Corp.*, 379 Md. 318, 327, 842 A.2d 1, 6 (2003). We, of course, read statutory language within the context of the statutory scheme, and thus our approach is a "commonsensical" one designed to effectuate the "purpose, aim, or policy of the enacting body." *Id.* at 327–28, 842 A.2d at 6–7.

Under COMAR 07.03.17.02B(6), aside from the provisions relating to veterans, a food stamp applicant may be considered disabled in five different ways, all of which depend on whether the applicant "is receiving" or "receives" benefits. The Meriam–Webster's Collegiate Dictionary defines "receive" as "to come into the possession of: acquire." MERIAM–WEBSTER'S COLLEGIATE DICTIONARY 975 (10th ed. 1995). Similarly, Black's Law Dictionary defines "receipt" as "the act of receiving something." BLACK'S LAW DICTIONARY 1274 (7th ed. 1999). In both definitions, "receives" unambiguously means the actual possession of something. We, therefore, conclude that a plain reading of COMAR 07.03.17.02B reveals that, unless the individual is a veteran, the definition of "disabled" for the purposes of the food stamp program requires the individual to *receive* some kind of disability-related benefit. *See* 1 AMERICANS WITH DISABILITIES PRACTICE & COMPLIANCE MANUAL § 1:177 (2003)(explaining that a disabled member of a household is defined as someone who has been awarded and re-

ceives disability payments); *see also Burnett v. Heckler,* 756 F.2d 621, 628 n. 4 (8th Cir.1985)(noting that, in the context of Supplemental Security Income payments, "[u]nearned income like disability benefits is considered 'income' for SSI purposes . . . but cannot be counted until actually received").

In a case similar to the case *sub judice,* the United States Court of Appeals for the Third Circuit has read the term "receives" in Section 2012(r) of the Food Stamp Act as actual receipt. *West,* 879 F.2d at 1126–27. In *West,* a woman applied for food stamps and Social Security disability benefits at the same time. *Id.* at 1124–25. Her food stamp application was held until the Social Security Administration determined that she was entitled to disability benefits. *Id.* Two years passed until the Social Security Administration deemed that she was entitled to disability benefits, and the woman claimed she was entitled to the two years of food stamp payments she did not receive during this interim period. *Id.* at 1125. The court disagreed, concluding that "receives" means "actual receipt" under Section 2012(r)(2), and the woman could not receive back payments of food stamps because she had not actually "received" her disability benefits during the two-year period. *Id.* at 1126–27.

Our sister court in Iowa also has interpreted the term "disabled" for the purposes of the Food Stamp Program as requiring the actual receipt of benefits. In *Lundy v. Iowa Dept. of Human Services,* 389 N.W.2d 392, 393 (Iowa 1986), Lundy's household, which was receiving food stamps, became ineligible for food stamps because he acquired a new truck that exceeded in value the household's "maximum resource level." Lundy argued that he needed the new truck because of his disability, and that the value of the vehicle should be excluded, pursuant to federal regulations, from his household's assets because the truck "was necessary to transport a 'physically disabled household member.'" *Id.* at 394. After examining the definition of disabled in 7 C.F.R. § 271.2, which is derived from Section 2012(r)(2), the Iowa Supreme Court determined that Lundy was not disabled for the purposes of the Food Stamp Program because, even though he had applied

for disability benefits, he did not receive them: "[Section 271.2] defines a "disabled member" as an individual receiving social security disability benefits. However, Lundy does not meet these criteria because at the time of the administrative proceedings Lundy has filed for, but not yet received, social security disability benefits." *Id.* (internal citations omitted).

 Nevertheless, in spite of the fact that "disabled" for the purposes of the Food Stamp Program plainly turns on the receipt of disability benefits, Christopher argues that she should be deemed to have "constructively received" disability benefits because her appeal has prevented her from receiving the disability benefits she *might* otherwise be entitled to. We disagree.

 If we accepted Christopher's argument, we would be expanding the definition of disabled beyond the confines of a state regulation that is derived from federal law. States must adhere to federal standards when implementing food stamp programs. 7 U.S.C.A. § 2014. Not only are "[s]tate or local policies or practice inconsistent with federal statutes or regu-lations ... invalid," *Harrington v. Blum*, 483 F.Supp. 1015, 1019 (S.D.N.Y.1979), but states may be financially liable for noncompliance. *See* 7 CFR §§ 276.1–276.7 (establishing state agency liabilities for not complying with federal guidelines). A state agency that fails to comply with federal law and regulations "may result in [the Federal Nutrition Service] seeking injunctive relief to compel compliance and/or a sus-pension or disallowance of the Federal share of the State agency's administrative funds." 7 C.F.R. § 276.1(a)(4). Sec-tion 276.2 of Title 7 of the Code of Federal Regulations provides, among other things, that "[s]tate agencies shall be strictly liable for ... [t]he value of coupons overissued and coupons issued without authorization...." 7 C.F.R. § 276.2(b)(1)(iii); *see Pennsylvania v. United States*, 781 F.2d 334, 338 (3d Cir.1986)(stating that states are liable for issuance errors resulting in financial loss, which includes errors where individuals receive benefits to which they are not entitled). Given that States must comply with federal guidelines and

risk financial penalty by not doing so, we are not inclined to impose "constructive receipt" onto the Maryland regulation, which must conform with federal law, when there is no federal (or state, for that matter) precedent for reading "receives" constructively in this context.[15]

"Constructive receipt" also contravenes the "purpose, aim, or policy" of the Food Stamp Program as it has been established in federal law. *See Knebel,* 429 U.S. at 289, 97 S.Ct. at 551, 50 L.Ed.2d at 488; *West,* 879 F.2d at 1124. As we explained *supra,* the Food Stamp Program's overall purpose is to assist individuals with limited financial resources. Eligibility for food stamps, logically enough, depends upon a household's net income, a quantifiable, bottom-line amount. *See* COMAR 07.03.17.43 (outlining how net monthly income is calculated under the Food Stamp Program). Factoring "constructive benefits" into that amount as Christopher urges, however, would create a net income that is inaccurate. It would not reflect the household's actual financial status, thus defeating the program's purpose to distribute food stamps based on a household's actual financial need.

Christopher's contention that she should be deemed to be constructively receiving "zero" benefits does not change our view. If the program's purpose is to distribute food stamps based on income, then it is income, indeed, that should be

---

**15.** We observe that courts have recognized "constructive dividends" in the federal income tax context when some kind of economic benefit is conferred. 10 MERTENS LAW OF FEDERAL INCOME TAXATION § 38B:44 (2004). As the United States Court of Appeals for the Fifth Circuit explained, "[i]n determining whether a constructive dividend has been made, '(t)he crucial concept . . . is that the corporation *conferred an economic benefit* on the stockholder without expectation of repayment.' " *Ireland v. United States,* 621 F.2d 731, 735 (5th Cir.1980) (emphasis added). Examples of conferred economic benefits include a taxpayer's use of a company car for personal purposes, use of a boat purchased by a company and used for personal purposes, and use of a residence furnished by the corporation. *Id.* In other words, before a court recognizes a "constructive dividend," the taxpayer must have *received* some kind of economic benefit amounting to a value more than zero. We, thus, are unable to accept that Christopher has "constructively received zero" when there is no indication that she has received anything, economic or otherwise.

calculated: "zero" constructive benefits does not change Christopher's net income for the purposes of the Food Stamp Program in any way. Piling legal fiction (constructive benefits) upon legal fiction (constructive benefits of "zero") only obfuscates the program's goal of calculating income as accurately as possible in order to distribute the appropriate allotment of food stamps based upon the individual's financial need. We cannot accept such an approach.[16]

For the above reasons, we reject Christopher's contention that she is "constructively receiving zero benefits." Therefore, the ALJ did not err as a matter of law when she determined that "receives" means "actual receipt" for the purposes of the disability requirement for the uncapped excess shelter cost deduction.

### 3. Arbitrary and Capricious

As we explained *supra*, "[w]hen the agency is acting in a fact-finding or quasi-judicial capacity, we review its deci-

---

**16.** Indeed, the administrative problems that certainly would follow if we adopted Christopher's view reveals why the uncapped excess shelter cost deduction turns on the receipt of disability benefits rather than their "constructive" receipt. Determining "constructive receipt" would place the Department in the position of evaluating on a case-by-base basis whether an applicant is likely to receive disability benefits, an evaluation that would consist of the Department predicting, based on its own estimation of an applicant's disability, whether or not an applicant *might* receive disability benefits. Because the Social Security Administration requires an interview and medical documentation, among other things, from the individual applying for disability benefits, and also issues a tome entitled *Disability Evaluation Under Social Security* that lists the medical criteria it uses to determine disability, we do not believe this would be a simple task. Nor is there any indication that it is within the Department's scope of responsibility or expertise to evaluate disability.

Furthermore, we observe that, under the approach Christopher advocates, every food stamp applicant and recipient waiting to be deemed eligible for disability benefits potentially could be entitled to the uncapped excess shelter cost deduction. Some of those disability applicants inevitably will be denied disability benefits, yet they will have received nevertheless a deduction for the interim period for which they applied. We, thus, are able to see, for this reason as well, why the Food Stamp Program requires actual receipt of disability benefits in order to avoid such an administrative quagmire.

sion to determine "whether the contested decision was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner." " *Giant Food, Inc. v. Dept. of Labor, Licensing and Regulation,* 356 Md. 180, 185, 738 A.2d 856, 858 (1999). According to Christopher, the ALJ acted "arbitrarily and capriciously" because she refused to recognize that Christopher was disabled for the purposes of the uncapped excess shelter cost deduction. Christopher also maintains that the ALJ "penalized" her for exercising her right to appeal the Library of Congress' decision to terminate her "for reasons of disability."

■ With respect to Christopher's contention that the ALJ improperly failed to deem her disabled based on her termination status from the Library of Congress, we conclude, based on our decision that "receives" means "actual receipt," that the ALJ did not abuse her discretion when she found that Christopher was disabled because she did not have the discretion to conclude otherwise in the first place. As we explained in *Spencer,* "[w]hether an action is in fact deemed arbitrary or capricious will vary depending upon the amount of discretion granted an agency, a matter of substantive law." 380 Md. 515, 531–33, 846 A.2d 341, 350–52, 2004 WL 439310, at *8. Here, regarding the uncapped excess shelter cost deduction, the ALJ had no discretion as a matter of substantive law because "disabled" so clearly turns on whether the applicant receives certain disability benefits. As the United States Court of Appeals for the Second Circuit has noted, the definition of disabled found in Section 2012(r)(2) of the Food Stamp Act "requires no discretion or judgment of officials in [a] food stamp program." *Huberman,* 884 F.2d at 66 (involving a case where the effective date of the uncapped shelter cost deduction was at issue). The disability determination under the Food Stamp Act, thus, is a straightforward one: either an individual receives disability benefits or he/she does not. The ALJ did not act arbitrarily or capriciously because she applied the regulation to the letter.

With respect to Christopher's argument that she has been "penalized" for taking an appeal, Christopher seems to suggest that she has been singled out, in an arbitrary and capricious manner, because she chose to appeal. She provides no factual support for her assertion; rather, she seems to base her argument on the fact that, because her appeal allegedly places her disability status in question, she has been penalized unfairly by the ALJ. We do not accept Christopher's logic. There is no evidence in the record that the ALJ treated Christopher any differently from any other applicant claiming to be disabled, acted inconsistently, or deviated from prior policies relating to disability determinations under the Food Stamp Program. *See Montgomery County v. Anastasi,* 77 Md.App. 126, 137, 549 A.2d 753, 758 (1988)(stating that, in the context of an agency's change in promotion procedures, "[a]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if any agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute"). Christopher's arbitrary and capricious claim thus fails in this regard as well.

### B. Equal Protection

Christopher argues that the Department's "interpretation of COMAR 07.03.17.43I(3) so as to deny an uncapped shelter deduction to Christopher and individuals similarly situated" violates the Equal Protection Clause of the Fourteenth Amendment and the equal protection component of Article 24 of the Maryland Declaration of Rights.[17] Acknowledging that Christopher is not in a protected class requiring strict scruti-

---

**17.** Section I of the Fourteenth Amendment to the United States Constitution includes the following guarantee: "No State shall … deny to any person within its jurisdiction the equal protection of the laws." "Although Article 24 [of the Maryland Declaration of Rights] does not contain an express equal protection clause, the concept of equal protection nevertheless is embodied in the Article." *Frankel v. Board of Regents of Univ. of Maryland System,* 361 Md. 298, 312–13, 761 A.2d 324, 332 (2000).

ny, Christopher claims that the Department has "no rational government interest" in distinguishing between individuals receiving disability benefits and those who do not when determining whether an individual is disabled under the Food Stamp Program.

Christopher asserts that she is not mounting a "facial challenge" to the regulation, and she conceded at oral argument that, if we were to determine that "receives" requires "actual receipt," her equal protection argument based on the Department's application or "interpretation" of the regulation automatically would fail. In other words, if "receipt" requires actual receipt, the regulation cannot be said to have been *applied* to her unconstitutionally because we will have concluded that she does not fall within its ambit in the first place.[18] *Cf. Bruce v. Director, Dept. of Chesapeake Bay*

---

**18.** Regarding Christopher's argument that the uncapped shelter cost deduction, which turns on the receipt of disability benefits, "penalizes" her for exercising her appeal of her termination, we believe that *Lyng v. Int'l Union, United Automobile, Aerospace and Agriculture Implement Workers of America, UAW*, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) is analogous. In *Lyng*, union members argued, *inter alia*, that a provision under the Food Stamp Act prohibiting households from becoming eligible for food stamps during the time when any member of the household is on strike violated the equal protection component of the Due Process Clause of the Fifth Amendment. *Id.* at 364, 108 S.Ct. at 1188, 99 L.Ed.2d at 387. The Supreme Court disagreed, stating that it had "little trouble in concluding that [the provision] is rationally related to the legitimate governmental objective of avoiding undue favoritism to one side or the other in private labor disputes." *Id.* at 371, 108 S.Ct. at 1192, 99 L.Ed.2d at 392. The Court acknowledged that the provision "work[ed] at least some discrimination" against strikers as compared to "voluntary quitters," but explained that, under the rational basis test, "even if the statute provides only rough justice, its treatment … is far from irrational." *Id.* at 371–72, 108 S.Ct. at 1192–93, 99 L.Ed.2d at 392 (quoting *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977))(internal quotations omitted). In short, although the food stamp policy may have negatively affected strikers, the Court nevertheless declined to find that strikers were entitled to food stamps on the basis that the provision "penalized" them, to use Christopher's words, for exercising their right to strike. We believe the same rationale applies here and hold that Christopher's equal protection rights were not violated because she is arguably "penalized" by the Food Stamp Program for exercising her right to appeal.

*Affairs,* 261 Md. 585, 600, 276 A.2d 200, 208 (1971)(stating that "we are mindful that if a law is applied and administered by public authority with an evil eye and an unequal hand so as to make unjust discriminations between persons in similar circumstances, material to their rights, such denial of equal justice is within the prohibition of the Constitution")(internal quotations omitted). Because we have concluded that receives means actual receipt, Christopher, as was pointed out in oral argument, is thus left with a facial challenge to the regulation and would have to argue that it, as written, violates the Equal Protection Clause, something she declined to do. We, therefore, need not consider this issue, as we "adhere[ ] to the established principle that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground." *Murrell v. Mayor & City Council of Baltimore,* 376 Md. 170, 191 n. 8, 829 A.2d 548, 560 n. 8 (2003) (quoting *Jordan v. Hebbville,* 369 Md. 439, 461 n. 20, 800 A.2d 768, 781 n. 20 (2002)).

### IV. Conclusion

Under the Food Stamp Act, and under COMAR 07.03.17.02B(6) specifically, a food stamp recipient must be receiving disability benefits in order to be entitled to an "uncapped excess shelter cost deduction." The ALJ, thus, properly denied Christopher's uncapped excess shelter cost deduction in this case.

*JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*