870 A.2d 168

Robert A. SCHWARTZ, et al.

v.

MARYLAND DEPARTMENT OF NATURAL RESOURCES.

No. 94, Sept. Term, 2004.

Court of Appeals of Maryland.

March 14, 2005.

Matthew A. Egeli (Hartman and Egeli, LLP, Anapolis, on brief), for appellants.

Rachel L. Eisenhauer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

RAKER, J.

We must decide in this case whether appellants were required to pay Maryland excise tax under section 8–716(c) of the State Boat Act, Md.Code (1973, 2000 Repl. Vol), §§ 8–701 *et seq.* of the Natural Resources Article. We shall hold that appellants are liable for the tax, albeit for different reasons than were relied upon by the Circuit Court.

I.

On June 9, 2000, appellants Robert and Joanne Schwartz purchased a new Symbol Model 557 yacht, later named the *Mahalo Hawaii IV* (hereinafter "the vessel"), from The Yacht Center dealership in Edgewater, Maryland.

On June 10, 2000, appellants signed a DNR form B–110, captioned "Certification of State of Principal Use."[1] Appellants indicated on the form that the vessel would be used principally in the State of Florida, and would be kept at an address in Key Colony Beach, Florida. The reverse side of the B–110 form contains the following language:

"The *Certification of State of Principal Use* is a dual-purpose form used when a vessel is to be used principally outside of Maryland and is, therefore, exempt from Maryland excise tax. It serves as the certification by the dealer that the purchaser has been advised about Maryland excise tax and as the purchaser's acknowledgment of the receipt of the information. All information requested on the certifica-

---

[1]. In addition to fields for identifying a vessel, its dealer, and its purchasers, the form contains the following language: "Owner Certification: I certify under penalty of perjury that the vessel described above will be used principally in the state of _____, and will be kept at (marina name or residence address) _____."

tion and the signature of the purchaser must be furnished. If the vessel was purchased from a Maryland licenced dealer, the dealer must also sign the certification.

State of Principal Use—The state or jurisdiction in which a vessel is used the greatest percentage of time in a calendar year.

Use—The operation, navigation, or utilization of a vessel. A vessel is considered in use whenever it is upon the water, whether it is moving, anchored, or tied up to any manner of dock or buoy. A vessel is also considered in use if it is kept in any structure in readiness for use. A vessel stored on a trailer in Maryland is considered to be in readiness for use."

Based on their execution of this form, appellants did not pay the 5% Maryland excise tax, due at the time of purchase, on the sale of a vessel in Maryland.

The record indicates that a DNR investigator observed the vessel in a slip at Mears Point Marina, in Grasonville, Maryland, on June 16, July 15, August 15, and September 28, 2000. It appeared to the investigator that no maintenance was being performed on the vessel on those dates. Because the vessel had been observed in Maryland over the summer months, DNR issued a Notification of Assessment to appellants, stating that the vessel had incurred a Maryland excise tax liability in the amount of $34,625.43, plus fees, penalties, and interest.

Appellants appealed the assessment, and on July 11, 2001, the Office of Administrative Hearings held a hearing pursuant to Md.Code (1973, 2000 Repl. Vol), § 8–716.2(e) of the Natural Resources Article.

Before the Administrative Law Judge (ALJ), appellants introduced into evidence the ship's log, which detailed twenty-four trips taken on the vessel between June 9, 2005 and October 28, 2005. Five of these trips were designated as "sea trials": one to set the autopilot, one to reset and check onboard electronics, one to calibrate compasses, one to reset the autopilot, and one to "test the ride" with respect to rolling. With the exception of this last trip, all of the designated "sea trials" were journeys of six miles or less. All five "sea trials"

were journeys from the vessel's slip at Mears Point Marina to some point in the water, returning to Mears Point without another destination. The remaining journeys ranged from ten to 144 miles, involved stops at various points around Maryland, one stop in Atlantic City, New Jersey, and included overnight stays on eight occasions. With the exception of the two-day trip to Atlantic City, New Jersey, the vessel remained in Maryland from the date of its purchase until October 28, 2000. The vessel arrived in Thunderbolt, Georgia on November 5, 2000, where it remained until Mr. Schwartz took it to Florida on January 23, 2001.

Mr. Schwartz testified that he and his wife were residents of Florida, had previously been residents of Delaware, and had never been Maryland residents. Appellants offered into evidence copies of Mr. Schwartz's Florida driver's license and voter registration card to support these statements. Mr. Schwartz acknowledged that appellants owned a summer residence in Stevensville, where they typically spent the months of May through September or October. According to Mr. Schwartz, appellants purchased a waterfront house in Florida specifically to accommodate the vessel, and extensively remedied its dock in anticipation of the vessel's requirements. Appellants produced the deed to the Florida residence, dated April 19, 2000, a building permit for the Florida dock renovations dated April 18, 2000, and invoices dated April 24 and 25 for the construction work. Mr. Schwartz testified that these improvements were made with some haste, because "I wanted to have this dock ready for this boat when I purchased the boat and went back to Florida with it."

Mr. Schwartz indicated that he had purchased the vessel knowing that it had some "major" problems, but expected that the dealer would continue to correct its problems after delivery. According to Mr. Schwartz, these warranty-covered defects prevented him from removing the boat from Maryland.

Appellants offered into evidence a list compiled by Mr. Schwartz, detailing various warranty repairs performed by The Yacht Center. The list recounted the following actions:

1. Relocation of fresh water filtration units, following an incorrect installation that prohibited the filters from being changed. Accomplished August 29, 2000.

2. Replacement of defective window blinds. Required four service visits from time of purchase to eventual correction by the end of July, 2000.

3. Investigation of engine voltage drop, possibly due to incorrect wiring. Required at least one service visit on September 7, 2000. It is unclear from the exhibit whether this problem was ever remedied.

4. Replacement of incorrect compass on upper station. Accomplished prior to July 12, 2000.

5. Removal of water intake from behind underwater exhaust and reinstallation in another location (necessary to prevent air conditioning from failing while vessel underway). Required two prior service visits to diagnose. Accomplished September 19, 2000.

6. Installation of new microwave oven to replace nonfunctioning original. Accomplished July 14, 2000.

7. Repair of trash compactor. Problem not discovered until August 26, 2000. Accomplished approximately September 11, 2000.

8. Replacement of incorrect propellers. Date not indicated.

9. Repair of malfunctioning cable master. Required two service visits. Accomplished September 6, 2000.

10. Replacement of incorrect anchor. Required two service visits. Accomplished September 1, 2000.

11. Repair of onboard television sets. Required two service visits. Problem not satisfactorily resolved.

12. Repair and eventual replacement of defective "bimini" canvas top. Required four service visits.

13. Repair of generator. Required two service visits. Problem not satisfactorily resolved.

Appellants introduced a letter from Mark A. Schulstad, President of The Yacht Center, stating that the vessel "required warranty repairs from June 2000 through October 2000."

Mr. Schwartz also testified to a more serious warranty issue: a persistent oil leak from the vessel's transmission. According to Mr. Schwartz, the beginnings of this problem were apparent "from day one," but it was not until September that a representative of the engine manufacturer informed Mr. Schwartz that the transmission would need to be removed from the vessel, repaired, and reinstalled. This process was accomplished over the one-month period, detailed *infra*, that the vessel was being outfitted with aftermarket stabilizers. Appellants introduced a letter from the engine manufacturer detailing the transmission work, as well as prior service activities. These included:

"June 17, 2000—June 22, 2000 Troubleshooting an active fault code

July 17, 2000—July 19, 2000 Troubleshooting and replacement of the Starter Motor

September 01—September 11, 2000 Troubleshooting and repair of Charging system

September 28, 2000—October 27, 2000 Troubleshooting and repair of oil leaks that required the removal and reinstallation of the vessel transmissions."

The most serious problem to which Mr. Schwartz testified was the vessel's tendency to roll significantly in even moderate seas. Schwartz stated that had noticed this behavior the first time he rode on the vessel, prior to his taking possession from the dealer. He recalled nine occasions over the course of the summer on which the vessel took significant rolls, several of which caused the vessel's furniture to overturn. After the third or fourth roll, Schwartz "deemed [the] boat to be totally unsafe," and felt that he could not safely take it to Florida with this problem for fear of capsizing *en route*. Schwartz testified that this opinion was based on his knowledge as a licensed boat captain.

The ship's log contained numerous references to the stability problem. On the occasion of his first trip with the Yacht Agency salesman, Mr. Schwartz wrote:

"Boat made a crazy roll to port upon going thru another boats heavy wake. Sea was very flat. Mike made a comment that the boat was bow steering, however, I have never seen this in flat seas. He told me I would find that the boat steered somewhat different than what I had experienced in other boats. I didn't question him because this was the 1st time that I had ridden in the boat but I was uncomfortable."

Additional log entries indicate as follows:

"6–11–00 ... The boat made another crazy roll to starboard in moderate seas. Was not sure what caused this.

\*     \*     \*

7–1–00 ... Got another crazy roll to port but not as bad as previous rolls. Sea was very flat. This seems to happen when the sea is from the beam.

\*     \*     \*

7–8–00 ... Encountered app. 1 foot seas to the starboard beam. Boat took a hard roll to port when turning into the beam sea. Furniture & tables turned over due to this hard roll. Feel the boat has something wrong with it but I am still trying to adjust to the steering because of what Mike P had told me.

\*     \*     \*

8–11–00 ... Seas were moderate but the boat rolled again when turning into a beam sea. Very dangerous roll.

\*     \*     \*

8–19–00 ... 1 to 2 ft seas.... Boat took another hard roll to port when turning into the beam sea. Furniture rolled all over inside the boat. There is definitely something wrong with this boat.

\*     \*     \*

8–27–00 . . . App. 2' waves from the beam port side coming up the bay. Made a 90 degree turn to starboard putting the seas to the port beam. I thought the boat was going to turn over. The boat rolled hard to port & starboard all the way up the bay. Wife got sick and had to go below. Chairs, tables & etc. flew all over the interior and put bad scratches in the beautiful cherry/holly pilothouse door. THIS BOAT IS NOT SAFE TO RIDE IN.

\* \* \*

9–16–00 . . . Atlantic City to Mears. Atlantic ocean had beam seas of app. 2/3'. Boat took several hard rolls to port and starboard. Wife got sick. Ran the boat app. 1½ miles off shore so we were sure to ride in the beam rollers going to shore to see if I could figure out what was wrong with this boat. Was forced to go out several miles to get out of the rollers to get away from the hard rolls. Upon entering the Delaware Bay, we had a head sea and the boat ran wonderful as it always has in head seas.

Made the decision that something had to be done about these hard rolls as this boat is definitely UNSAFE. I am sure this boat will roll completely over someday in a heavy beam sea or entering a rough inlet. Something must be done ASAP as this boat is not seaworthy.

9–23–00 . . . Sea trial for hard rolling. The wind was blowing hard with app. 3' waves. A good time to test the ride. Boat rolled beyond an acceptable ride."

Mr. Schwartz testified that he contacted Jim Booth, sales manager for Holiday Marine Sales, LLC, "one of the largest Symbol dealers in the United States." Appellants introduced an affidavit from Booth, who described himself as "extremely familiar with the operating characteristics of Symbol Yachts, including the 557 model." Booth averred that it is the practice of Holiday Marine Sales to install Wesmar RS600 aftermarket stabilizers on all Symbol Model 557 yachts, to correct that model's tendency to roll excessively.

Mr. Schwartz testified that he contracted with the Oxford Yacht Agency to install the stabilizers. Appellants introduced

a written estimate from Oxford Yacht Agency, in the amount of $33, 930, and stating "Work to commence week of October 1st. Please allow two weeks for job to be accomplished." Mr. Schwartz explained that a delay in obtaining parts had caused the installation to last until October 26th. During this period, he stated, the vessel was out of the water and kept within a building. It was also during this period that the transmission work, detailed *supra,* was accomplished.

Schwartz testified that he took the vessel on a sea trial on October 26th, and was satisfied that the stabilizers were having the desired effect. During this sea trial, however, an electronic problem developed which prevented him from transferring control of the vessel among its three piloting stations. In order to fix this problem, a part needed to be air-freighted from the State of Washington. The vessel was fully operational by October 28th, and then appellants departed Maryland waters. Appellants introduced into evidence a bill for the electronics work.

With respect to the vessel's failure to reach Florida before the end of 2000, Mr. Schwartz testified that the vessel broke down twice *en route,* once in North Carolina and once in South Carolina, the latter incident requiring a three-day stop for repairs. According to Mr. Schwartz, appellants left the vessel in Georgia in favor of a rental car because they wished to vote in the 2000 presidential elections and could not reach their home county in time by sea. He indicated that they did not return to the vessel after the election because they took a previously scheduled two-week vacation in Australia. Upon his return from Australia, Mr. Schwarz testified, he proceeded to Delaware for year-end accounting at his automobile dealership and to spend the holidays with his children and grandchildren. He claimed that a serious computer malfunction required his presence at the dealership for six weeks, preventing him from collecting the boat until late January.

DNR called Robert Wilson, general manager of the Mears Point Marina. Wilson produced and authenticated Marina records showing Mr. Schwartz's slip rental contracts for the

periods May 1, 2000 to October 15, 2000 and May 1, 2001 to October 1, 2001. Wilson also authenticated a letter he had written to DNR, stating "Mr. Schwartz is a long-time slipholder at Mears Point Marina and has always brought his previous vessels from Florida to Mears Point Marina in mid-May and departed in early October. Mr. Schwartz is a very knowledgeable captain and maintains meticulous records in his ship's log." Wilson acknowledged on cross-examination that some slipholders do not keep their boats at the Marina for their entire rental periods. He also testified that he had frequently observed maintenance and repair work being performed on the vessel.

Francis Keller, an investigator for DNR's Boat Tax Enforcement unit testified that he had observed the vessel in its slip at Mears Point on June 16, 2000, July 5, 2000, August 15, 2000, and September 28, 2000, and that the boat appeared "ready for use" on each occasion. He clarified that he considered the vessel "ready for use" because he "didn't see anyone working on it," and the vessel "was in the water like it was ready for use." On cross-examination he estimated that he had spent two to three minutes observing the boat on each occasion, for a total of twelve minutes. He acknowledged that he did not know whether the vessel's transmissions or generators had been working, or whether the boat had been suffering from stability problems.

David Van Dyke, Program Director of the Tax Enforcement Unit of the Natural Resources Police, also testified for DNR. He indicated that he considered himself to be experienced in the mechanics and operability of boats, based on twenty-five years' boating experience and on having passed the Master Exam Coast Guard for 100 ton vessels. Mr. Van Dyke testified that, in his opinion, removal of both transmissions would have rendered the vessel inoperable, that removal of a single transmission would have rendered the vessel difficult to operate, but not inoperable, and that work performed on the starter motors likely had rendered the vessel inoperable for approximately twenty hours. But he testified that, from his examina-

tion of the other repair documentation, it could not be established that such repairs had rendered the vessel inoperable.

On cross-examination, Mr. Van Dyke stated that he had never operated a fifty-seven foot boat, that he had never taken a boat to Florida, that he had no knowledge about Mr. Schwartz's competency as a captain, and that he was not a mechanic. He also stated his opinion that installation of the aftermarket stabilizers had been "by choice," and not essential to the vessel's seaworthiness.

Before the ALJ, both parties agreed that Md.Code (1973, 2000 Repl.Vol.), § 8–716(c) of the Natural Resources Article[2] imposes a 5% excise tax upon the titling or sale of any vessel within the State of Maryland. The parties further agreed that a purchaser who certifies on form B–110 that a vessel will be "used principally" in a state other than Maryland is not required to pay the tax. The parties agreed implicitly that, rather than the definition set forth on the reverse of form B–

---

2. Unless indicated otherwise, all subsequent statutory references will be to Md.Code (1973, 2000 Repl. Vol.), Natural Resources Article. Because the taxable event at issue occurred in 2000, we refer to the law as it existed in that year. Section 8–716(c) has not been amended since 2000. Post–2000 amendments to other sections of the State Boat Act will be addressed *infra* where relevant.

Section 8–716(c) provides, in pertinent part:
"(1) Except as provided in § 8–715(d) of this subtitle and in subsections (e) and (f) of this section, and in addition to the fees prescribed in subsection (b) of this section, an excise tax is levied at the rate of 5% of the fair market value of the vessel on:
(i) The issuance of every original certificate of title required for a vessel under this subtitle;
(ii) The issuance of every subsequent certificate of title for the sale, resale, or transfer of the vessel;
(iii) *The sale within the State of every other vessel;* and
(iv) The possession within the State of a vessel purchased outside the State to be used principally in the State."
(Emphasis added.)

The exceptions contained in §§ 8–715(d) and 8–716(f) apply only to the § 8–716(c)(1)(iv) tax on possession. The sale-related exceptions in § 8–716(e) concern transfers to family members, dealers, the government, and charitable organizations; the remaining exceptions in § 8–716(e) apply only to the tax on possession. Thus, none of the statutory exceptions is applicable here.

110, "used principally" should have the meaning assigned in § 8–716(a)(3):

> " 'Used principally in this State' means that this State is the state of principal use as defined in § 8–701(n) [3] of this subtitle, except that in calculating where the vessel is used or used most, a vessel is not considered to be in use for any period of time that it is held for maintenance or repair for 30 consecutive days or more."

Appellants argued that the vessel had been "held for maintenance or repair for 30 consecutive days or more" during its entire stay in Maryland, and that none of this time should count towards the calculation of principal use. In particular, they drew attention to the fact that most of the work done on the vessel consisted of warranty repairs performed by the Maryland dealer. They also contended that the vessel had not been safe for the ocean voyage to Florida until completion of the stabilizer installation on October 26, 2000. They further argued that, even if the vessel had not been "held for maintenance or repair," it should not be considered "used principally" in Maryland because it had been used in the State for less than six months.

DNR argued that, regardless of the state of principal use, a vessel purchased in Maryland must be removed from Maryland within 30 days to qualify for the exemption. Assuming that principal use was an issue, DNR argued that the vessel should only be considered "held for maintenance or repair" during periods when it was completely inoperable. In any event, it contended, the evidence did not support appellants' contention that the vessel had remained in Maryland solely because of its maintenance requirements. It also argued that

---

**3.** Section 8–701(n) provides: " 'State of principal use' means the state on whose waters a vessel is used or to be used most during a calendar year."

Section 8–701(p) provides: " 'Use' means to operate, navigate, or employ a vessel. A vessel is in use whenever it is upon the water, whether it is moving, anchored, or tied up to any manner of dock or buoy. A vessel is also in use if it is kept in any structure in readiness for use."

DNR's longstanding policy was to base principal use calculations on calendar years ending December 31. Because the vessel had not been "used" by appellants anywhere prior to its purchase, DNR contended that principal use therefore turned on whether the boat had been used more in Maryland than in any other state from June 9 to December 31, 2000.

On September 5, 2001, the ALJ found that the vessel had been in Maryland 140 days in 2000 from the time of purchase to the time of departure. She credited appellants with time "held for maintenance or repair for 30 consecutive days or more" only for those times she found the vessel to have been actually inoperable or unusable. Further, she found four periods of inoperability: June 17–22, July 17–19, September 19, and September 28 to October 27. Only the final period lasted thirty days or longer, and the ALJ accordingly subtracted thirty days from the vessel's use in Maryland, leaving 110 days. In making this determination, the ALJ noted that only five of the vessel's summer voyages were logged as "sea trials," and that "the vast majority of the trips appear to be for pleasure to various destinations."

The ALJ held that principal use should be calculated from the date of purchase to the end of the calendar year, because the excise tax liability does not arise until the time of purchase. She determined that the vessel had spent fifty-seven days in Georgia, and less than ten days total in Virginia and the Carolinas in 2000. She thus held that the vessel's 110 days of use in Maryland made this State the state of principal use. Accordingly, the ALJ concluded that DNR's assessment was proper and not subject to revision.

Appellants noted exceptions to the Secretary of Natural Resources. They argued that the language of § 8–716(a)(3) did not support a reading that a vessel must be completely inoperable to qualify as "held for maintenance or repair." They again argued that "principal use" requires use for more than six months in a calendar year. The Secretary issued the final decision on January 31, 2002. With regard to "maintenance or repair," the Secretary stated as follows:

"Whether a vessel is 'held for maintenance and repair' depends on the facts. The vessel does not need to be 'totally inoperable,' as the Department argued to the ALJ. Rather, the vessel must, in fact, have been held for maintenance and repair 'for 30 consecutive days or more.' In this case, the ALJ ... specifically found that 'not all of [the repair] problems prevented the Appellants from using the vessel....' For example, the Appellants made 24 voyages on their vessel from June 11 through September 28, only five of which were for sea trials. She concluded and I agree that the vessel was 'in use' in Maryland for this period of time. The only time it was not in use—held for maintenance or repair for 30 consecutive days or more—was from September 29 through October 27. The ALJ properly excluded this time from the calculation of "use" in Maryland."

With regard to the calculation of principal use, the Secretary held:

"there is no six-month requirement in the law.... A tax is due upon the sale or transfer of a vessel, or upon the movement of a vessel into Maryland waters. Here, Appellants purchased the vessel on June 9 in Maryland, and a tax was due. Appellants did not pay this tax because they certified that they were going to move the vessel to Florida. But as the ALJ noted, from the date of purchase until the end of the 2000 calendar year, 'the vessel did not spend a single day in the State of Florida.' "

Appellants filed a petition for judicial review in the Circuit Court for Queen Anne's County. The primary focus of both sides' arguments before the Circuit Court was whether appellants qualified for an exemption of the excise tax based on a factual determination of whether the vessel was "held for maintenance or repair" in Maryland. Appellants argued that "[a]lthough the Secretary correctly construed the 'maintenance or repair' exemption, [his] Final Decision was erroneous because it failed to consider the Petitioners' extensive maintenance or repair evidence in light of the exemption." DNR argued that the Secretary's factual findings with respect to

the duration of "use" versus "maintenance or repair" periods were supported by substantial evidence. Appellants also challenged the Secretary's legal conclusion that a vessel may be used principally in Maryland even if it spends less than six months in the State. DNR argued that its construction of the statutory term "used principally in this state" as containing no six-month requirement was entitled to deference.

To the surprise (and dismay) of both parties, the Circuit Court decided the case not on a factual basis but rather on legal grounds: that no exemption exists under the statute, and that the court could not "invent an exemption." Because the court held the "exemption" found by the ALJ and the Secretary did not exist, it reversed the decision of the Secretary of Natural Resources and remanded the case to the Secretary, with instructions to dismiss the appeal.

Appellants noted a timely appeal to the Court of Special Appeals. We issued a Writ of Certiorari on our own initiative before consideration by that court. *Schwartz v. DNR*, 383 Md. 569, 861 A.2d 60 (2004).

## II.

Before this Court, both parties argue that the Circuit Court erred in concluding that there is no exemption to the excise tax provision of the State Boat Act. DNR argues that since the 1989 addition of a sales and use tax to the State Boat Act, it has interpreted the Act as not requiring dealers to collect the excise tax from buyers of vessels who certify under penalty of perjury that the vessel will be used principally outside of Maryland. DNR supports its argument with the longstanding principle that an agency's interpretation and administration of its statute is entitled to deference.

In support of its argument, DNR points to The Boat Dealers Manual, a published DNR document, containing the B110 form, "Certification of State of Principal Use," and the specific instructions for dealers in reference to persons who make the required certification. In addition, DNR relies on the inaction of the General Assembly, which has neither

legislatively revoked nor modified DNR's published practice despite having amended the State Boat Act several times in the eighteen years that Act has provided for the tax. *See, e.g.,* Md.Code (1973, 2000 Repl.Vol., 2002 Cum.Supp.), § 8–716(e)(8) of the Natural Resources Article (amending statute to permit non-residents to bring vessels into Maryland for up to ninety days without incurring an excise tax); Md.Code (1973, 2000 Repl.Vol., 2002 Cum.Supp.), § 8–716(a)(4) of the Natural Resources Article (amending statute to exclude sea trials of vessels from calculations of principal use under certain conditions); Md.Code (1973, 2000 Repl.Vol., 2004 Cum. Supp.), § 8–716(k) of the Natural Resources Article (amending statute to provide definition of "held for maintenance or repair.") Appellants essentially join in DNR's legal construction of the Act.

Appellants argue that "[a]lthough the Secretary correctly construed the 'maintenance or repair' exemption, [his] Final Decision was erroneous because it failed to consider the Petitioners' extensive maintenance or repair evidence in light of the exemption." Appellants point again to the evidence which they introduced before the ALJ. They suggest that any contradictory evidence presented by DNR was speculative and superficial. They contend that many of the periods during which no repair work was performed can be explained by the delays in ordering parts and scheduling technician services during the busy summer months.

Finally, appellants repeat their argument that Maryland cannot be "the state on whose waters a vessel is used or to be used most during a calendar year" under § 8–701(n) if a vessel spends less than six months in Maryland. They suggest that this language is ambiguous, and open to two contradictory interpretations. Under the first interpretation, principal use would be calculated based on a full calendar year. Under the second, if the owner purchased the vessel during a year in question, only that portion of the year which follows the purchase would be considered. According to appellants, the former interpretation is correct; their vessel would not qualify as "principally used in Maryland" under that test; and the

Secretary erred in applying the latter interpretation. They argue that the Secretary's reading leads to absurd results and treats similarly situated taxpayers differently. They point out that a person purchasing a boat on January 1 of a particular year could potentially keep the boat in Maryland for 162 days without incurring an excise tax liability, whereas under the Secretary's interpretation, their vessel's 110 adjusted (140 gross) days subjects them to liability.

DNR argues that substantial evidence supports the Secretary's finding that the vessel was "held for maintenance or repair" for only thirty days. In particular, it points to the Secretary's observation that nineteen of the vessel's twenty-four voyages appeared to have been for pleasure, and that the vessel's operational problems therefore did not prohibit its "use" by appellants. It also contends that appellants' regular May through October stays in Maryland suggest that the vessel was not being kept in the State merely for maintenance or repair in 2000.

DNR asserts that nothing in § 8–701(n) supports appellants' suggestion that a vessel must remain in Maryland six months of a calendar year before it is considered principally used in this State. Rather, it contends that the Secretary correctly applied the law by comparing the vessel's 110 adjusted days in Maryland with the fifty-seven it spent in Georgia, and determined that Maryland was the state of principal use. It further suggests that determining "principal use" in this manner is a longstanding administrative policy of DNR, and thus entitled to deference.

### III.

Review of a decision of the Department of Natural Resources is governed by the Administrative Procedure Act, Md.Code (1984, 2004 Repl.Vol.), §§ 10–101 *et seq.* of the State Government Article. Section § 10–222(h) of the State Government Article provides as follows:

"(h) In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision;  or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted;  or

(vi) is arbitrary or capricious."

■ In reviewing the decision of an administrative agency, we evaluate the decision of the agency under the same statutory standards as would the circuit court. *Spencer v. State Board of Pharmacy*, 380 Md. 515, 523–24, 846 A.2d 341, 346 (2004). We therefore assume without deciding that DNR could properly grant the tax exemption at issue, and consider only whether the Secretary erred in concluding that appellants were not entitled to the exemption as a matter of fact. In doing so, we will assume that the parameters of the exemption are as defined by the parties—that purchasers are entitled to the exemption if their vessels are not "used principally in this State" as defined in § 8–716(a) of the Natural Resources Article.

Many Maryland cases have set out the standard for judicial review of administrative agency decisions. We have often stated that ordinarily a court will only review the actions of an administrative agency to determine if its conclusions are, as a matter of law, arbitrary, capricious, or contrary to law, and that before a court will review the administrative agency's actions as to whether they are arbitrary, capricious, or contrary to law, the court must have the record of the evidence submitted to the agency.

■ When an agency decision encompasses a mixed question of law and fact, we review it under the "substantial

evidence" standard provided in Md.Code (1984, 2004 Repl. Vol.), §§ 10–222(h)(3)(v) of the State Government Article. *Charles County v. Vann*, 382 Md. 286, 296, 855 A.2d 313, 319 (2004); *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 838, 490 A.2d 1296, 1303 (1985). Substantial evidence review is narrow; the question is not whether we would have reached the same conclusions, but merely whether "a reasoning mind" could have reached those conclusions on the record before the agency. *Vann* at 295, 855 A.2d at 318; *Board of Physician Quality v. Banks*, 354 Md. 59, 67–68, 729 A.2d 376, 380–81 (1999). *See Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512–13, 390 A.2d 1119, 1123–24 (1978). We appraise an agency's fact finding in the light most favorable to the agency, and this deference extends to subsequent inferences drawn from that fact finding, so long as supported by the record. *Christopher v. Montgomery County Dept. of Health*, 381 Md. 188, 199, 849 A.2d 46, 52 (2004). Indeed, " 'not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences.' " *Gigeous v. ECI*, 363 Md. 481, 504, 769 A.2d 912, 926 (2001) (quoting *Bulluck*, 283 Md. at 513, 390 A.2d at 1124). We give great deference to the agency's assessment of the credibility of the witnesses. The agency's determination of factual issues will be upheld if the record of the agency proceeding affords a substantial basis of fact from which the issue can be reasonably inferred.

With respect to an agency's conclusions of law, we have often stated that a court reviews *de novo* for correctness. *Spencer*, 380 Md. at 528, 846 A.2d at 348–49. We frequently give weight to an agency's experience in interpretation of a statute that it administers, but it is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong. *Christopher* at 198, 849 A.2d at 52; *Balto. Lutheran High School Assn. v. Emp. Sec. Adm.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985).

The difficult problem presented in the case *sub judice* is that the Circuit Court for Queen Anne's County ruled on an issue that was never raised before the agency. We recognize

the conundrum the Circuit Court faced: the court believed that the State Boat Act did not contain the exemption that both parties, the administrative law judge, and the Secretary of DNR believed to exist, yet the issue was one of law, never raised before the agency.

In *Brodie v. MVA*, 367 Md. 1, 785 A.2d 747 (2001), the petitioner raised a single legal issue that had never been raised during the administrative proceedings. Brodie's driver's license had been revoked by the Motor Vehicle Administration (MVA) and he requested a hearing before the Office of Administrative Hearings. The administrative law judge upheld the revocation and Brodie filed in the Circuit Court a petition for judicial review. Before the Circuit Court, he argued that the MVA could not revoke a driver's license when that license has already been revoked. This legal argument had never been presented in the administrative proceedings and was raised in the Circuit Court for the first time. The Circuit Court addressed his argument on the merits, rejected it, and affirmed the administrative decision. *Id.* at 3, 785 A.2d at 748.

■■ We granted Brodie's petition for Writ of Certiorari, which raised the single legal question decided by the Circuit Court. We affirmed the Circuit Court, without addressing the merits of the legal issue presented, holding that "[s]ince Brodie's entire challenge to the administrative decision was based on an issue not raised before the agency, the Circuit Court should have affirmed the administrative decision without reaching the issue." *Id.* at 5, 785 A.2d at 749. We reiterated our standard of judicial review and generally accepted practice with regard to agency decisions, stating that a reviewing court ordinarily

" 'may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency. Stated differently, a .... court will review an adjudicatory agency decision solely on the grounds relied upon by the agency.' "

*Id.* at 4, 785 A.2d at 749 (quoting *Dept. of Health v. Campbell,* 364 Md. 108, 123, 771 A.2d 1051, 1060 (2001)).

Under the aegis of *Brodie,* unless the question of whether an exemption actually exists under the statute is encompassed in the final decision of the administrative agency, we should not review the circuit court decision addressing it. A reasonable argument can be made that when the agency considered whether appellants qualified for an exemption, the premise that the exemption *exists* under the Act was encompassed implicitly in the final decision of the administrative agency. On the other hand, a reasonable argument can be made that, since the question of whether an exemption exists was neither raised, briefed, nor argued, that issue is not encompassed in the final agency decision. Because, even if the exemption exists, we agree with the agency decision that appellants are not entitled to the exemption as a matter of fact, we will not in this case decide whether the Circuit Court was correct in its construction of the statute.[4]

Whether and for how long the vessel was "held for maintenance or repair" is a mixed question of law and fact. That is, its resolution requires not only factual findings as to the vessel's movements and maintenance history, but also construction of the somewhat ambiguous statutory language in light of those facts.[5]

---

**4.** This case should provide fair notice to the Department of Natural Resources, boat dealers, boat builders, and potential boat purchasers that the exemption at issue may not exist under the statute. Inasmuch as the Circuit Court for Queen Anne's County may well have been correct in its interpretation, DNR might consider proposing to the Legislature language clarifying or amending the statute to provide explicitly for that which is reflected in Form 110B.

**5.** The phrase "held for maintenance or repair" is susceptible to various interpretations. Does "held" mean "held by a mechanic?" If so, must the vessel be in the mechanic's physical custody, or merely brought regularly to the mechanic for a course of maintenance? Or does "held" mean "held in Maryland"—*i.e.* kept here rather than removed to some other state? If so, must maintenance be the only reason, the primary reason, or just one reason among many the vessel remains here? Can the vessel be operable? Can it be used for pleasure trips as well as sea trials? What ratio of pleasure trips to sea trials is permissi-

■ Upon review of the record before the agency, we hold that there is substantial evidence to support the decision of the agency. We find that the Secretary's findings and inferences with respect to maintenance or repair were within the province of a reasoning mind. The Secretary construes "held for maintenance or repair for 30 consecutive days or more" to require a period of thirty or more consecutive days during which a vessel is not used for any purpose unrelated to maintenance. With regard to the meaning of "held for maintenance or repair," the Secretary stated:

> "The vessel does not need to be 'totally inoperable.' ...
> Rather, the vessel must, in fact, have been held for maintenance and repair 'for 30 consecutive days or more.' ...
> [The ALJ] specifically found that 'not all of [the repair] problems prevented the Appellants from using the vessel....' For example, the Appellants made 24 voyages on their vessel from June 11 through September 28, only five of which were for sea trials. She concluded and I agree that the vessel was 'in use' in Maryland during this period of time. The only time it was not in use—held for mainte-

---

ble? Is the owner's intent relevant? The resolution of these questions is inextricably intertwined with the factual determinations at issue.

We note that the current version of § 8–716 does contain a definition of "held for maintenance or repair" which would seem to resolve some but not all of these questions for future determinations:

"(k) *Vessel held for maintenance or repair.*—(1) For purposes of subsection (a)(4) of this section, a vessel is deemed to be held for maintenance, repair, or commissioning if:

(i) The maintenance, repair, or commissioning work is provided in exchange for compensation;

(ii) The maintenance, repair, or commissioning work is performed pursuant to a schedule preestablished with one or more marine contractors; and

(iii) The total cost of the maintenance, repair, or commissioning work is at least two times the reasonable current market cost of docking or storing the vessel.

(2) Time spent conducting sea trials shall be included when calculating the period of time a vessel is held for maintenance, repair, or commissioning under subsection (a)(4) of this section."

Md.Code (1973, 2000 Repl.Vol., 2004 Cum.Supp.), § 8–716(k) of the Natural Resources Article.

nance or repair for 30 consecutive days or more—was from September 29 through October 27."

This construction is not unreasonable.

The Secretary concluded that nineteen of appellants' trips prior to September 28, 2000 were not taken as sea trials—*i.e.* were taken for non-maintenance purposes. The Secretary adopted and incorporated the factual findings of the ALJ, who noted that only five trips were recorded in the ship's log as sea trials, and that these trips were distinguishable by the short distances traveled and the lack of destinations or overnight stays. The ALJ concluded that "[t]he vast majority of the trips appear to be for pleasure to various destinations," and we find this inference to be reasonable in light of the record. Conflicting testimony was presented to the ALJ, requiring the ALJ to make credibility assessments. The ALJ had the parties before her, had an opportunity to observe them while they testified, and determined which witness' testimony to accept. The Secretary relied on the ALJ's findings.

The Secretary and ALJ found, based on the testimony and evidence presented at the hearing, that appellants intended to keep their vessel in Maryland for the summer boating season regardless of its maintenance needs.[6] Appellants maintained that the vessel was in Maryland and used in Maryland to diagnose operational problems, or that appellants had every intention of removing the vessel to Florida but were stymied by mechanical and stability issues. The ALJ heard the evidence, viewed the witnesses, and made a credibility determination; neither the ALJ nor the Secretary was clearly erroneous in disbelieving appellant. Because we conclude that the Secretary's findings and inferences are supported by substantial evidence, we hold that he did not err in deciding that the

---

6. While the intentions underlying appellants' decision to keep the vessel in Maryland are not directly relevant under the Secretary's construction of "held for maintenance or repair," this finding does provide support for the inference that many of the vessel's summer 2000 trips were taken for pleasure, not maintenance.

vessel had been "held for maintenance or repair" only during the thirty days it spent at the Oxford Yacht Agency.

█ The issue of whether a vessel can be "used principally in this State" if kept here fewer than six months in a given year is solely a question of law. Where statutory language is unambiguous when construed according to its ordinary and everyday meaning, we give effect to the statute as it is written. *Collins v. State*, 383 Md. 684, 688–89, 861 A.2d 727, 730 (2004). The parties agree that the language of Md.Code (1973, 2000 Repl.Vol.), § 8–701(n) of the Natural Resources Article controls the determination of "principal use" in this case. That statute provides: " 'State of principal use' means the state on whose waters a vessel is used or to be used most during a calendar year."

This language is not ambiguous. *Calendar year* is defined in *Black's Law Dictionary* via a cross-reference to *year*, the first definition of which is given as follows: "1. Twelve calendar months beginning January 1 and ending December 31.— Also termed *calendar year.*" *Black's Law Dictionary* 1646 (8th ed.2004). The inclusion of *calendar year* as a synonym for this type of *year* stands in contrast to *Black's* second definition of *year*—for which *calendar year* is not given as a synonym—"2. A consecutive 365–day period beginning at any point; a span of twelve months." *Id.*

█ The statute thus defines the state of principal use as "the state on whose waters a vessel is used or to be used most" during the period lasting from January 1 of the year in question to the following December 31. The language is susceptible to only one reading: if a vessel is used more in Maryland than it is used in any other state during a given calendar year, Maryland is the vessel's "state of principal use." The plain language will not support appellants' proposed six-month requirement. Appellants would apparently have us replace "used or to be used *most during* a calendar year" with "used or to be used *for most of* a calendar year." As we have often stated, "we will 'neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by

the words the Legislature used or engage in a forced or subtle interpretation in an attempt to extend or limit the statute's meaning.' " *Serio v. Baltimore County,* 384 Md. 373, 390, 863 A.2d 952, 962 (2004) (quoting *O'Connor v. Baltimore County,* 382 Md. 102, 114, 854 A.2d 1191, 1198 (2004)).

If a vessel happens to be used in only two states throughout a calendar year, then it is true that the vessel will not be "principally used" in Maryland unless it spends at least 183 days (approximately six months) here. But that is not the only situation in which a vessel could be "used most" in Maryland. A vessel used five months in Maryland, four months in Delaware, and three months in Virginia would still be "used most" in this State. A vessel acquired by its owners midway through the year—thus not "used" by them in any state prior to purchase—and then used in Maryland fewer than six months but longer than in any other state would still be "used most" in this State.

This latter possibility describes precisely the facts *sub judice.* The vessel was not used by appellants prior to June 9, 2000. After adjusting for time spent "held for maintenance or repair," it was used for 110 days in Maryland, fifty-seven days in Georgia, and ten days total in other states. The Secretary did not err in finding that the vessel was "used principally" in Maryland in the year 2000.

*JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY VACATED.*

*CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE ORDER OF THE SECRETARY OF THE DEPARTMENT OF NATURAL RESOURCES. COSTS TO BE PAID BY APPELLANTS.*

WILNER, J., Dissents.

Dissenting Opinion by WILNER, J.

Although I agree entirely with the Court that appellants are not entitled to the exemption from the State Boat Excise Tax that they seek, in part for the reason stated by the Court, I

dissent from the judgment vacating the judgment of the Circuit Court and from what, to me, is the unwarranted refusal of the Court to address the one important issue in the case. I would affirm the judgment of the Circuit Court because it was right.

With but a handful of exceptions, none of which apply in this case, this Court is a *certiorari* court. Review is discretionary. Maryland Code, § 12–203 of the Courts and Judicial Proceedings Article provides that "[i]f the Court of Appeals finds that review of the case described in § 12–301 is desirable and in the public interest, the Court of Appeals shall require by writ of certiorari that the case be certified to it." That is the standard we use in determining whether to review a case on appeal—whether review is desirable and in the *public* interest, whether it has public importance beyond the interest of just the particular litigants. Although we have been somewhat uneven in implementing that provision, we have generally recognized a duty, once we have granted *certiorari* because we believe that an issue of public importance requiring a definitive, binding, precedential decision by this Court is presented, to address and resolve that issue, unless for some good reason we conclude, after reading the briefs and listening to argument, that the issue is not properly presented or cannot for some other procedural reason be decided.

We took this case before any decision by the Court of Special Appeals. Although three issues were raised in appellants' brief, only one, to me, justified our taking the case—whether the Circuit Court was correct in concluding that no exemption from the State Boat Excise Tax exists when the boat is purchased in Maryland for use principally outside the State. That was the sole basis upon which the Circuit Court's judgment rests, and it was the flagship issue raised by appellants in their brief, upon which our decision to grant *certiorari* was based. It is an issue of public importance in Maryland, which is a maritime State possessing a vibrant boating industry and hosting boat shows of national and international significance.

There is nothing of any public importance about whether there was legally sufficient evidence in an administrative record to document how many days appellants' boat was undergoing repair during the year 2000. That is entirely factual and, however decided, would be of little or no precedential value to anyone other than the litigants here. Yet the Court deliberately omits to address the only issue worthy of this Court's consideration and, instead, wades through an intensely factual administrative record searching for the straws of evidence to support the Secretary's conclusion that the boat was used in Maryland for 110 days.

The legal issue resolved by the Circuit Court needs to be addressed and determined by this Court, for otherwise it will continue to lurk in the law, affect an important revenue measure for the State, and cast a shadow of doubt on every boat sale in Maryland in which the owner certifies an intent to use the boat elsewhere.

It is particularly important for us to address that issue because, if the Circuit Court's conclusion is correct, which I believe it is, the Department of Natural Resources is deliberately declining to collect a tax that the General Assembly has specifically charged it with collecting. By nothing more than its own policy directive, it has created an exemption found nowhere in the statute, and until such time as this Court holds that policy invalid, the Department will persist in not collecting the tax and the State will not receive the revenue that the General Assembly has declared it should receive. The issue that the Court hopes might some day arise in an administrative proceeding likely will never arise in that context. The boat purchaser will always assume that the departmentally-created exemption applies, *as will the Department,* and the fight will always be over some other exemption. That has been true for many years. Because neither of the adversarial parties has any incentive to raise the issue of the "principal use" exemption that does not exist in the statute, the hope of ever getting a proper administrative determination by the Department of Natural Resources is likely a forlorn one.

If the Circuit Court's reading of the statute is correct, but may cause some economic hardship to the boating industry in Maryland, the industry can ask the General Assembly, which is now in session and will remain in session for another month, to reconsider the tax statute and create the exemption that is not presently there. That is the normal way, and a perfectly effective way, in which a statutory construction decision by this Court can be reviewed by the Legislature. If the General Assembly believes that the kind of exemption created by the Department of Natural Resources should exist, it can easily and quickly place it into the law. To acknowledge but then fail to address the issue will, because of the lingering uncertainty, create more of a hardship for the boating industry than a clear decision which, unfavorable to the industry, can easily be corrected by the Legislature.