*In the Matter of Abigail Sulerzyski*, No. 302, September Term 2022.  Opinion by Beachley, J.

**ADMINISTRATIVE AGENCIES—REGULATORY INTERPRETATION—MEDICAID**

Appellee Abigail Sulerzyski, a Medicaid participant with numerous complex medical needs who had been receiving 137 hours of private duty nursing services ("PDN") per week, requested an additional 31 hours of PDN from appellant, the Maryland Department of Health.  With the additional hours, Ms. Sulerzyski would have been receiving "24/7 PDN."  Ms. Sulerzyski is a participant in the Rare and Expensive Case Management program ("REM"), which, in COMAR 10.09.69.11A(4), requires that PDN services be "rendered in accordance with COMAR 10.09.53," the regulations governing nursing care for the Early and Periodic Screening, Diagnosis, and Treatment program ("EPSDT").

The Department denied Ms. Sulerzyski's request.  Ms. Sulerzyski appealed this decision to the Office of Administrative Hearings.  The Department filed a motion to dismiss for failure to state a claim.  Ms. Sulerzyski attached supporting affidavits to her response to the motion to dismiss.  The administrative law judge ("ALJ") converted the motion to dismiss to a motion for summary decision based on his consideration of the affidavits.  The ALJ granted summary decision based on his interpretation of 10.09.53.04A(10), which requires participants receiving PDN services to have a caregiver who is able to care for the participant when a nurse is not available, and 10.09.53.05B, which the ALJ interpreted to mean that PDN is unavailable when the caregiver is not asleep, at work, or at school.

Ms. Sulerzyski sought judicial review in the Circuit Court for Anne Arundel County.  The circuit court vacated the ALJ's decision, ruling that the ALJ improperly converted the motion to dismiss into a motion for summary decision.  The Department appealed.

*Held*: Affirmed.  The Appellate Court of Maryland affirmed the judgment of the Circuit Court for Anne Arundel County and remanded the case to the Office of Administrative Hearings for further proceedings.

The Court concluded that the ALJ erred in granting summary judgment in favor of the Department.  First, the Court determined that, while COMAR 10.09.53.04A(10) requires participants receiving PDN care to have an available caregiver when a nurse is not available, the ALJ erred in accepting the Department's argument that 10.09.53.05B restricts PDN care to times when the caregiver is unavailable due to his or her sleep, work, or school schedules.  The Court concluded that the ALJ's interpretation imposed conditions that were inconsistent with Maryland and federal caselaw that mandates the provision of services based on medical necessity.  Second, the Court held that Ms. Sulerzyski's mother's affidavit produced sufficient evidence for summary decision purposes that Ms. Sulerzyski had a "caregiver" as contemplated by 10.09.53.04A(10).

Circuit Court for Anne Arundel County
Case No. C-02-CV-21-000054

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 302

September Term, 2022
_____

IN THE MATTER OF
ABIGAIL SULERZYSKI
_____

Kehoe,
Beachley,
Tang,

JJ.
_____

Opinion by Beachley, J.
_____

Filed: March 1, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland.  The name change took effect on December 14, 2022.

This case involves appellee Abigail Sulerzyski's request for 31 additional hours of private duty nursing ("PDN") services per week through the Maryland Medical Assistance Program.[1]  Because she already receives 137 hours per week of PDN services, granting Ms. Sulerzyski's request for the additional hours would result in her receiving "24/7 PDN" services.  After a summary decision by an administrative law judge ("ALJ") affirmed the Maryland Department of Health's ("Department") denial of her request for 24/7 PDN services, Ms. Sulerzyski sought judicial review in the Circuit Court for Anne Arundel County.  The circuit court reversed the ALJ's decision, ruling that the ALJ improperly converted the Department's motion to dismiss into a motion for summary decision, and remanded the matter for further proceedings.  The Department noted this timely appeal and presents a single question for our review:

> Did the administrative law judge correctly grant summary decision in favor of the Department when the service requested by Ms. Sulerzyski was not covered by Medicaid and, therefore, [was] unavailable to her as a matter of law?

We conclude that the ALJ erred in granting summary decision in favor of the Department.  We shall therefore affirm, albeit on a different ground than that relied upon by the circuit court.

---

[1] Private duty nursing services are defined as "nursing services for beneficiaries who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility."  42 C.F.R. § 440.80.

**FACTUAL AND PROCEDURAL BACKGROUND**

The underlying facts are essentially undisputed. According to an affidavit submitted by Ms. Sulerzyski's mother, Victoria Sulerzyski ("Mother"), Ms. Sulerzyski has been diagnosed with numerous medical conditions, including deafness, blindness, Intestinal Neuronal Dysplasia, Digestive System Dysmotility, Autism Spectrum Disorder, Profound Intellectual Disability, and Cerebral Palsy. Because of her medical conditions, Ms. Sulerzyski suffers from severe gastrointestinal deficiencies, which require, according to Mother's affidavit: "16-hour continuous feeds and all of her medication except for one" through a jejunostomy,[2] a gastrostomy tube that is "open to a 24-hour drainage system," and a colostomy through which she receives enemas "on a regular basis."

Ms. Sulerzyski has received PDN services most of her life, beginning when she was nine months old. She attended the Maryland School for the Blind as a residential student from 2015 until her graduation in 2020, returning home on the weekends. During this time, Ms. Sulerzyski received PDN services 21 hours per day on weekdays and 16 hours per day on weekends, amounting to 137 hours of PDN services per week, "as an enrollee in the Home Care for Disabled Children under a Model Waiver."[3] When Ms. Sulerzyski reached 21 years of age, she was transitioned from the Model Waiver program to the Rare and

---

[2] A jejunostomy is an opening made in the jejunum (a part of the small intestine) allowing a feeding tube to be placed in the small intestine. *Jejunostomy*, NATIONAL CANCER INSTITUTE: NCI DICTIONARY OF CANCER TERMS, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/jejunostomy (last visited Jan. 18, 2023).

[3] Home Care for Disabled Children Under a Model Waiver is described in COMAR 10.09.27.01, *et seq.*

Expensive Case Management program ("REM"),[4] and continued receiving a total of 137 hours of PDN per week. Her parents arranged for Ms. Sulerzyski to live in a private residence near their home either by herself or with another disabled roommate.

As part of the plan to enable Ms. Sulerzyski to live in her own home, she requested the Department, through its Division of Nursing Services, to increase her approved hours of weekly PDN services to "24/7 PDN services," *i.e.*, 168 hours per week. The Division of Nursing Services denied Ms. Sulerzyski's request based on a COMAR regulation that premises PDN services on the availability of "at least one caregiver willing and able to accept responsibility for the participant's care when the nurse . . . is not available." COMAR 10.09.53.04A(10). Because the Division of Nursing Services determined that Ms. Sulerzyski did not have a person who satisfied the Department's regulatory requirements for a willing and able caregiver, it concluded that it had "no choice but to abandon the development of the proposed assessment plan."

Ms. Sulerzyski appealed this decision to the Office of Administrative Hearings ("OAH"). The Department moved to dismiss the appeal, arguing that Ms. Sulerzyski failed to state a claim upon which relief could be granted because the REM regulations do not provide for 24/7 PDN services except in the case of temporary exigent circumstances. Ms. Sulerzyski attached three affidavits to her opposition to the motion to dismiss, including the affidavit of Mother, and affidavits from two individuals involved in Ms. Sulerzyski's transition to the new home. Mother's affidavit addressed the caregiver requirement relied

---

[4] REM is described in COMAR 10.09.69.01, *et seq.*

on by the Division of Nursing Services in denying the request for 24/7 PDN services, stating, in part, that: "Abigail's aunt, Donna Abramczyk, has agreed to be a willing and able caregiver when nursing services are unavailable;" "I [(Mother)] work full-time and have a medical condition that limits my ability to be an alert and awake caregiver;" and "Abigail's father and legal guardian, David Sulerzyski, works full-time and is on call on weekends." Additionally, Ms. Sulerzyski attached her Service Funding Plan, which describes the extensive medical services she requires.

A remote hearing was held on December 1, 2020. The arguments advanced by the parties at the hearing were substantially similar to their arguments in this appeal, which we discuss in detail below.

Because the ALJ considered the affidavits attached to Ms. Sulerzyski's opposition, he treated the Department's motion to dismiss as a motion for summary decision.[5] The ALJ found that there was no dispute of material fact:

---

[5] The OAH procedural regulations provide in COMAR 28.02.01.12:

C. Motion to Dismiss. Upon motion, the ALJ may issue a proposed or final decision dismissing an initial pleading that fails to state a claim for which relief may be granted.

D. Motion for Summary Decision.

(1) A party may file a motion for summary decision on all or part of an action on the ground that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law.

(2) A motion for summary decision shall be supported by one or more of the following:

(continued)

4

The matter before me is not whether [Ms. Sulerzyski] needs 24/7 care, but whether [Ms. Sulerzyski] has a caregiver as required under the regulations, and she, by her own admission, does not. The affidavit of her mother and guardian, attached to the Opposition, confirms that both of her guardians are unable to act as caregivers and the person she identified as her caregiver is only available for emergencies.

The ALJ concluded that a REM participant "is required to have a caregiver who is available to provide services beyond emergencies," and granted summary decision in favor of the Department.

---

       (a) An affidavit;

       (b) Testimony given under oath;

       (c) A self-authenticating document; or

       (d) A document authenticated by affidavit.

(3) A response to a motion for summary decision:

       (a) Shall identify the material facts that are disputed; and

       (b) May be supported by an affidavit.

(4) An affidavit supporting or opposing a motion for summary decision shall:

       (a) Conform to Regulation .02 of this chapter;

       (b) Set forth facts that would be admissible in evidence; and

       (c) Show affirmatively that the affiant is competent to testify to the matters stated.

(5) The ALJ may issue a proposed or final decision in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

Ms. Sulerzyski requested judicial review of the ALJ's decision in the Circuit Court for Anne Arundel County. The circuit court vacated the ALJ's decision, ruling that the ALJ erred in converting the motion to dismiss into a motion for summary decision.[6] The Department noted this timely appeal.

## STANDARD OF REVIEW

"In an appeal from judicial review of an agency action, we look through the decision of the circuit court and review the agency's decision directly." *Concerned Citizens of Cloverly v. Montgomery Cnty. Plan. Bd.*, 254 Md. App. 575, 598 (2022) (quoting *W. Montgomery Cnty. Citizens Ass'n v. Montgomery Cnty. Plan. Bd.*, 248 Md. App. 314, 332–33 (2020)). When we review an ALJ's granting of summary decision, "we are concerned with whether there was a dispute as to any material fact and, if not, whether the movant was entitled to judgment as a matter of law." *I.B. v. Frederick Cnty. Dep't of Soc. Servs.*,

---

[6] Because we affirm the circuit court's judgment vacating the ALJ's decision on other grounds, we need not decide whether a motion to dismiss before an ALJ may be converted to a motion for summary decision based on the non-moving party's inclusion of matters outside the pleading in its response. We note that the regulations governing OAH procedure provide that an ALJ shall "[t]ake action to avoid unnecessary delay in the disposition of the proceedings," and an ALJ has the power to "[i]ssue such orders as are necessary to procure procedural simplicity and administrative fairness and to eliminate unjustifiable expense and delay." COMAR 28.02.01.11A(2), B(12). We also note that, in a court proceeding, the Maryland Rules provide that "If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment[.]" Md. Rule 2-322(c). In such event, the parties are to be "given reasonable opportunity to present all material" relevant to a motion for summary judgment. *Id.* In any event, Ms. Sulerzyski has not proffered any prejudice she sustained as a result of the ALJ's conversion of the motion to dismiss to a motion for summary decision.

239 Md. App. 556, 562 (2018) (quoting *Casey v. Grossman*, 123 Md. App. 751, 765 (1998)).

When reviewing the agency's findings of fact, we apply the "substantial evidence" standard, "under which the court defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences." *Concerned Citizens of Cloverly*, 254 Md. App. at 598 (quoting *Md. Dep't of Env't v. Cnty. Comm'rs*, 465 Md. 169, 201 (2019)).

> With respect to an agency's legal conclusions, a reviewing court accords the agency less deference than with respect to fact findings or discretionary decisions. In particular, a court will not uphold an agency action that is based on an erroneous legal conclusion. However, in construing a law that the agency has been charged to administer, the reviewing court is to give careful consideration to the agency's interpretation.

*Id.* (citations omitted) (quoting *Md. Dep't of Env't*, 465 Md. at 202–03).

## DISCUSSION

### I. GENERAL OVERVIEW OF THE MEDICAID PROGRAM

Because this case concerns Medicaid regulations, we begin by providing a short background to the Medicaid program. The Medicaid Act was first enacted by Congress in 1965, and was

> designed to enable states, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services. To that end, the Act established a medical assistance program, which is a jointly funded collaboration between the states and the federal government. It is a voluntary program, in which a state may elect, but is not compelled, to participate.

*Jackson v. Millstone*, 369 Md. 575, 580 (2002). The federal government will reimburse the state a portion of the cost of an approved Medicaid program. *Id.*

7

While the federal government establishes broad policy, secures state compliance with the statute, and dispenses federal funds to supplement state spending on [M]edicaid, there exists some latitude for each state to determine which of its citizens qualify for this form of medical insurance and which services its program will provide. The state agency charged with dispensing the state [M]edicaid program is responsible for interpreting, administering, and complying with federal [M]edicaid statutes and regulations. Within broad federal rules, each state decides eligibility groups, types and range of services, payment levels for services, and administrative and operating procedures.

*Id.* at 580–81. The State of Maryland "cannot set a higher bar for eligibility [for a Medicaid program] than is prescribed by the federal government." *Md. Dep't of Health & Mental Hygiene v. Brown*, 177 Md. App. 440, 465 (2007).

"Maryland has chosen to participate in the [M]edicaid program . . . through the Maryland Medical Assistance Program, operated by the Department of Health." *Jackson*, 369 Md. at 581. The Maryland Medical Assistance Program contains numerous "sub-programs" within it, including two relevant to the present case—the Rare and Expensive Case Management program ("REM"), and the Early and Periodic Screening, Diagnosis, and Treatment program ("EPSDT"). COMAR 10.09.69; COMAR 10.09.53. Both of these programs are governed by federal and state Medicaid statutes and regulations.

Although REM is not specifically mentioned in the federal statutes or regulations, because the REM program was created as part of Maryland's implementation of Medicaid, it is subject to federal Medicaid requirements for each of the services it covers. As previously noted, this case involves Ms. Sulerzyski's request for "private duty nursing services," which are defined in federal regulations as "nursing services for beneficiaries who require more individual and continuous care than is available from a visiting nurse or

8

routinely provided by the nursing staff of the hospital or skilled nursing facility." 42 C.F.R. § 440.80. PDN may only be provided by a registered nurse ("RN") or licensed practical nurse ("LPN"). 42 C.F.R. § 440.80(a). "Each service" provided under Medicaid "must be sufficient in amount, duration, and scope to reasonably achieve its purpose," although "[t]he agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(b), (d).

We note that the federal EPSDT requirements for services provided to children (defined in the federal regulations as individuals under age 21) are significantly more detailed than requirements related to the services for adults over age 21 that Maryland provides through REM. Because the dispute in this case centers on the scope of REM's incorporation of EPSDT regulations, our analysis requires us to examine and consider relevant EPSDT regulations even though Ms. Sulerzyski is no longer eligible for EPSDT services.

The federal requirements for EPSDT programs are substantially found in 42 U.S.C. § 1396d(r), which defines "early and periodic screening, diagnostic, and treatment services." The multiple subsections of 42 U.S.C. § 1396d(r) provide a list of the minimum required services a state must provide under its EPSDT program. These include screening, vision, dental, and hearing services as well as "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(1)–(5). Subsection (a) of 42 U.S.C. § 1396d defines the term "medical

9

assistance," and enumerates thirty-one categories of types of medical care, including PDN.

## II. THE INTERPRETATION ISSUE

As mentioned above, Ms. Sulerzyski has received PDN services since infancy and, upon reaching the age of 21, she became a participant in the REM program. A list of requirements for coverage of REM PDN services is provided in COMAR 10.09.69.11A, which provides in relevant part,

> A. The Program shall cover shift nursing services provided by an RN or LPN when:
>
> (1) The services are more individualized and continuous than what is available under the home health program;
>
> (2) The services are delivered to the participant in the participant's home, in school, or in other normal life activity setting or settings which occur outside the participant's home;
>
> (3) Services are provided to a REM participant who is 21 years old or older; [and]
>
> (4) Services are rendered in accordance with COMAR 10.09.53[.]

The requirement in 10.09.69.11A(4) that REM PDN services be "rendered in accordance with COMAR 10.09.53," *i.e.*, the EPSDT regulations, is at the center of this appeal.

The parties agree that COMAR 10.09.69.11A(4) incorporates 10.09.53.04A, B, and C into the REM program, although the Department argues that other EPSDT sections are also incorporated. Sections B and C of 10.09.53.04 address specific requirements for EPSDT services rendered by RNs and LPNs, such as documentation of services and periodic supervisory visits, and are not directly relevant in this appeal. Section A of 10.09.53.04 is similar to the REM provision 10.09.69.11A, providing a list of requirements

10

for "covered" PDN services.[7]   COMAR 10.09.53.04A sets forth ten requirements for participants to receive EPSDT services, some of which overlap those listed in 10.09.69.11A governing REM services.  The principal issue on appeal is the interpretation of the requirement in 10.09.53.04A(10):

> (10) Participant has at least one caregiver willing and able to accept responsibility for the participant's care when the nurse . . . is not available.

The parties fundamentally disagree about when a caregiver needs to be available under 10.09.53.04A(10).  The parties also disagree whether 10.09.53.05B (part of EPSDT's "Limitations" provision) is applicable to Ms. Sulerzyski's request for REM PDN care.  COMAR 10.09.53.05B provides:

> Services to substitute for care ordinarily rendered by the caregiver or caregivers shall be considered medically necessary:
>
> (1) When the services meet the requirements of Regulation .04A of this chapter; and
>
> (2) When the:
>
>   (a)  Participant requires an awake and alert caregiver at all times;
>
>   (b)  Caregiver or caregivers provide documentation, including work schedule, commuting times, and school attendance records . . . , that substitute care is necessary to allow employment or school attendance; or
>
>   (c)  Caregiver or caregivers provide documentation of emergency circumstances, as determined by the Department, including but not limited to the inability of the primary caregiver to provide care due to hospitalization or an acute debilitating illness for up to a 60-day period.

---

[7] COMAR 10.09.53.04A includes similar EPSDT services rendered by a CNA or HHA.  The parties agree that PDN services may only be provided by an RN or LPN.

11

The Department contends that this EPSDT provision is incorporated into REM's PDN coverage requirements. In its brief, the Department concisely summarizes its argument why 24/7 PDN services are not authorized as a matter of law:

> [I]n the absence of a willing and able caregiver who can and will render the participant's care during the hours they do *not* work, attend school, or sleep, PDN services are not covered by Medicaid. PDN licensed nurses are therefore *never* available on a 24/7 basis because that arrangement would necessarily exclude the daily participation of the willing and able caregiver(s) required by COMAR 10.09.53.04A(10), 10.09.53.05A(12),[8] and 10.09.53.05B, rendering the regulatory framework superfluous. Rather, the regulations make the services of a licensed nurse available only as an adjunct to the willing and able caregiver's care during the three specific circumstances noted in 10.09.53.05B. At all other times, the responsibility for rendering the participant's nursing care belongs to the gratuitous willing and able caregiver(s).

The ALJ accepted the Department's argument that PDN services are available during the three specific circumstances provided in COMAR 10.09.53.05B, *i.e.*, while the caregiver is sleeping, working, or attending school.[9]

Ms. Sulerzyski responds that the Medicaid regulations focus on providing services that are medically necessary. As noted, she accepts COMAR 10.09.53.04A(10)'s requirement that she must have "at least one caregiver willing and able to accept responsibility" for her care when "the nurse . . . is not available," but she contends that

---

[8] COMAR 10.09.53.05A(12) provides that the EPSDT program does not cover "[s]ervices specified in Regulation .04 of this chapter which duplicate or supplant services rendered by the recipient's family caregivers or primary caregivers as well as other insurance, privilege, entitlement, or program services that the recipient receives or is eligible to receive[.]"

[9] The parties do not dispute that PDN services may be provided in "emergency circumstances" as described in COMAR 10.09.53.05B(2)(c).

12

Mother's affidavit sufficiently satisfies—at least for summary decision purposes—the regulation's caregiver requirement. She interprets 10.09.53.05B as expanding the scope of medically necessary skilled nursing services by creating an additional category of medically necessary care for participants while their caregivers sleep, work, and attend school. In Ms. Sulerzyski's view, the Department's interpretation of the EPSDT provision 10.09.53.05B as imposing limitations on REM PDN participants "violates the medical necessity standard required by federal and state law."[10] She further notes that the EPSDT and REM regulations do not explicitly limit the number of PDN service hours a participant may receive.

### III. ANALYSIS

Our analysis begins with the "medical necessity" standard that permeates Medicaid programs and their enabling regulations. 42 U.S.C. § 1396d(r)(5) requires states to provide as part of Medicaid EPSDT services "[s]uch other necessary health care [and] treatment . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by screening services[.]" Maryland's EPSDT regulations define "medically necessary" as:

---

[10] We note that COMAR 10.09.53.05B(2)(a) provides that "[s]ervices to substitute for care ordinarily rendered by the caregiver . . . shall be considered medically necessary . . . [w]hen the [p]articipant requires an awake and alert caregiver at all times[.]" The parties did not address the significance of this provision either at the administrative level or on appeal. Because we conclude that 10.09.53.05B does not restrict or limit medically necessary REM PDN care, we shall not offer any opinion as to 10.09.53.05B(2)(a)'s meaning or application.

13

[T]he service or benefit is:

(a) Directly related to diagnostic, preventive, curative, palliative, rehabilitative, or ameliorative treatment of an illness, injury, disability, or health condition;

(b) Consistent with currently accepted standards of good medical practice;

(c) The most cost efficient service that can be provided without sacrificing effectiveness or access to care; and

(d) Not primarily for the convenience of the consumer, family, or provider.

COMAR 10.09.53.01B(15); 10.09.36.01B(13).

Although there is no federal mandate that the Department provide medically necessary services to REM participants, Maryland has promulgated regulations specifically governing REM programs. *See* COMAR 10.09.69.01, *et seq.* We initially note that REM's definition of "medically necessary" is nearly identical to the EPSDT definition.[11] Under "Covered Services – General Requirements," 10.09.69.09 provides:

For participants in the REM program, the Program covers and shall reimburse for services specified in Regulations .10 and .11 of this chapter when these services are:

A. Medically necessary;

B. Prescribed by a:

(1) Physician;

(2) Physician assistant; or

---

[11] The only difference between the definitions is the wording of subsection (d), which appears in the REM definition as: "Not primarily for the convenience of the participant, the participant's family, or the provider." COMAR 10.09.69.02B(35)(d).

(3) Nurse practitioner;

C. Preauthorized, when required, by the Department;

D. Rendered in accordance with accepted health professional standards;

E. Rendered in accordance with the treatment plan or physician's, physician assistant's, or nurse practitioner's order, or both; and

F. Delivered by an enrolled Medical Assistance provider.

COMAR 10.09.69.09.

Thus, one of the principal threshold requirements for both EPSDT and REM coverage is whether the requested services are medically necessary. On that point, there appears to be little or no dispute that Ms. Sulerzyski's request for 24/7 PDN care is "medically necessary." We note that the Service Funding Plan indicated that Ms. Sulerzyski's "medical needs have warranted [her] being assigned a nurse through REM 24 hours a day," and the ALJ found it to be undisputed that she "requires 24/7 care." At the administrative hearing, the Department stated: "We aren't arguing (inaudible) necessity here at all. We acknowledged that (inaudible) is certainly entitled to the maximum (inaudible) 10.09.69 or that whole (inaudible) 10.09.53." Though the transcript is not entirely clear, the Department appeared to concede that Ms. Sulerzyski requires 24/7 PDN-level care. Indeed, in its appellate brief, the Department adopts the ALJ's conclusion that the issue to be determined "was not one of 'medical necessity.'"

Having determined that the record confirms that Ms. Sulerzyski's request for 24/7 PDN services meets the "medically necessary" threshold for "covered services," we turn to the crux of the Department's argument—that the regulations, properly interpreted, place

limitations on the provision of PDN services so as to preclude 24/7 PDN as a matter of law. To resolve that issue, we look to accepted principles of statutory and regulatory interpretation.

"When we construe an agency's rule or regulation, 'the principles governing our interpretation of a statute apply.'" *Concerned Citizens of Cloverly*, 254 Md. App. at 605 (quoting *Hranicka v. Chesapeake Surgical, Ltd.*, 443 Md. 289, 298 (2015)). "We 'will give effect to the [regulation] as it is written' so long as 'the words of the [regulation], construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning.'" *Id.* at 606 (quoting *Moore v. RealPage Util. Mgmt., Inc.*, 476 Md. 501, 511 (2021)). Where the language of the regulation is ambiguous, "we look to the agency's interpretation of its own regulation." *Id.* at 606 (quoting *Bd. of Liquor License Comm'rs for Balt. City v. Kougl*, 451 Md. 507, 517 (2017)). We will defer to the agency "unless the agency's interpretation is clearly erroneous or inconsistent with the regulation." *Id.* (quoting *Para v. 1691 Ltd. P'ship*, 211 Md. App. 335, 389 (2013)). However, this deference must be tempered with the principle that "remedial statutes are to be construed 'liberally' in favor of claimants, to suppress the evil and advance the remedy." *Cathey v. Bd. of Rev., Dep't of Health and Mental Hygiene*, 422 Md. 597, 605 (2011) ("The 'evil' in this context is the disability that causes Cathey to be unable to live independently, and the 'remedy' is the services that are provided by the state to assist the disabled adult."). Additionally, we must consider the regulations in the context of the entire regulatory and statutory scheme. *Kougl*, 451 Md. at 516 ("We conduct this plain language inquiry within the context of the regulatory scheme, and 'our approach is a commonsensical one designed

16

to effectuate the purpose, aim, or policy of the enacting body.'" (quoting *Christopher v. Montgomery Cnty. Dep't of Health & Human Servs.*, 381 Md. 188, 209 (2004))).  In this case, the regulatory and statutory scheme includes both the state and federal Medicaid statutes and regulations.

As previously noted, the parties agree that COMAR 10.09.69.11A(4) at a minimum incorporates the EPSDT provisions of 10.09.53.04A, B, and C, and that consequently the caregiver requirement of 10.09.53.04A(10) applies to REM PDN services.[12]  We likewise agree that 10.09.69.11A(4) incorporates only those parts of the EPSDT regulations that concern coverage requirements for PDN services.  Indeed, the express language of the REM regulation states that "[t]he Program shall cover shift nursing services provided by an RN or LPN when: . . . (4) Services are rendered [by an RN or LPN] in accordance with COMAR 10.09.53."  Moreover, the organization of the REM and EPSDT regulations is similar, each containing sections that describe their "Covered Services" as well as separate provisions governing, *inter alia*, "Limitations,"[13] "Preauthorization Requirements,"[14] "Recovery and Reimbursement,"[15] and "Payment Procedures."[16]  The only parts of the

---

[12] Because the parties agree that a caregiver is required, we shall assume, without deciding, that the caregiver requirement complies with federal and state law.  *See* footnote 22.

[13] COMAR 10.09.53.05; 10.09.69.12.

[14] COMAR 10.09.53.06; 10.09.69.13.

[15] COMAR 10.09.53.08; 10.09.69.15.

[16] COMAR 10.09.53.07; 10.09.69.14.

17

EPSDT regulations that describe coverage requirements for PDN services are 10.09.53.04A, B, and C. We therefore agree that these three subsections of 10.09.53.04 are incorporated into REM by virtue of 10.09.69.11A(4).[17]

We do not agree, however, with the Department's argument that EPSDT's limitations provision, COMAR 10.09.53.05, is incorporated into REM's PDN coverage requirements. COMAR 10.09.69.11A and 10.09.53.05 serve different purposes within their respective chapters. COMAR 10.09.69.11A describes *coverage* requirements for REM PDN services; its "coverage" analog in EPSDT is 10.09.53.04. COMAR 10.09.53.05 concerns *limitations* on all types of EPSDT services; its "limitations" analog in REM is 10.09.69.12. It defies common sense to interpret 10.09.69.11A(4)—a regulation concerning REM PDN coverage—as incorporating "Limitations" applicable to EPSDT, especially in light of the fact that REM also has a separate and distinct "Limitations" section. *See* COMAR 10.09.69.12. Furthermore, incorporation of 10.09.53.05 into REM would create irreconcilable inconsistencies. For example, 10.09.53.05A(11) provides that EPSDT will not cover "[s]ervices not ordered by the recipient's primary medical provider as a result of a partial or complete EPSDT screen." Because REM participants do not

---

[17] To the extent that the Department suggests that the entirety of the EPSDT regulations in 10.09.53, consisting of 10.09.53.01 through .11, are incorporated into the coverage requirements for REM PDN services, we reject that argument. To construe the regulation in this broad manner would mean that EPSDT provisions regarding licensing requirements for service providers, preauthorization requirements, and payment of service providers by the Department would all be part of the REM PDN coverage requirements. Because such an interpretation would result in substantial overlap and inconsistencies in the EPSDT and REM regulations, we summarily reject that interpretation as illogical.

18

undergo EPSDT screens, that EPSDT provision cannot logically be incorporated in REM. Additionally, 10.09.53.05D provides: "Nursing services may only be provided to EPSDT eligible individuals under 21 years old." But REM participants must be over 21 years old. If this age-specific EPSDT limitation were incorporated into REM's PDN coverage requirements, REM PDN services would not be available to any of the program's participants. In short, that the respective "Limitations" sections in REM (10.09.69.12) and EPSDT (10.09.53.05) are each independently comprehensive in nature—sometimes overlapping and sometimes inconsistent with one another—compels the conclusion that the EPSDT limitations provisions were not meant to be incorporated in REM.

Even if we were to assume that COMAR 10.09.69.11A(4) incorporated 10.09.53.05B, as the Department suggests, the Department's interpretation is contrary to 10.09.53.05B's plain language. Looking at 10.09.53.05B within the context of the EPSDT framework, we agree with Ms. Sulerzyski that this provision describes an *additional* category of "medically necessary" services.[18] After delineating services not covered by EPSDT in section A, 10.09.53.05 proceeds in section B to define services that "shall be considered medically necessary." Thus, under the regulation "[s]ervices to *substitute for care ordinarily rendered by the caregiver*" are deemed medically necessary if (1) the services "meet the requirements" of EPSDT coverage in 10.09.53.04A and (2) a caregiver is physically unavailable due to sleep, work, school, or temporary emergency. In this way,

---

[18] Because COMAR 10.09.53.05B is located in the general EPSDT "Limitations" provision, it concerns not only PDN services, but also services rendered by CNAs and HHAs under 10.09.53.04A and D.

19

10.09.53.05B expressly delineates care as "medically necessary" that might otherwise not be considered medically necessary, or would be barred by one or more of the limitations listed in 10.09.53.05A. This interpretation is bolstered by 10.09.53.05B's placement in the "Limitations" provision immediately after the list of circumstances wherein the Department will not cover EPSDT services, indicating that its purpose is to act as an exception to or explanation of those limitations.[19]

If COMAR 10.09.53.05B acted as the Department suggests—to limit the availability of otherwise medically necessary care to only those times when the caregiver is physically unavailable—certain other provisions concerning EPSDT PDN services would be undermined. The services described in 10.09.53.04A(6) ("supervision of family caregivers in the home while family caregivers practice the skills necessary to provide care to the recipient in accordance with the established plan of care") would be impossible to provide, because, by limiting nursing services to only those times when a caregiver is unavailable as a result of sleep, work, or school, there would be no time during which family caregiver supervision could occur. Additionally, under the Department's interpretation that PDN services are available only when the caregiver is asleep, at work, or attending school, 10.09.53.04H ("Services shall be decreased as the caregivers become better able to meet the participant's needs") would generally only come into effect when the caregiver's sleep, work, or school schedules decrease.

---

[19] For example, this provision clarifies that the prohibition of services provided merely "for the convenience or preference of the recipient or the primary caregiver" does not preclude coverage of services provided for the purpose of allowing caregivers to sleep, work, or attend school. *See* COMAR 10.09.53.05A(14).

We further note the Department's own application of its regulations does not follow its stated interpretation that COMAR 10.09.53.05B defines the *only* times during which PDN is available.  Although this issue can be further developed on remand, the 137 hours of PDN services that Ms. Sulerzyski currently receives apparently are not based on her caregivers' work, school, and sleep schedules.  Moreover, the Department's statement before the ALJ that "When somebody transitions back into their [home], it is not unusual to get additional extra hours that are for the purposes of ensuring the willing and able caregivers are properly trained," is inconsistent with its stated interpretation that PDN services are defined and limited by the caregivers' work, school, and sleep schedules.

Finally, the Department's interpretation that PDN services are available only when the caregiver is sleeping, working, commuting, or attending school as described in COMAR 10.09.53.05B(2) appears to be inconsistent with applicable caselaw.  The Supreme Court of Maryland[20] has held that federal statutes require states to provide EPSDT participants with medically necessary care, without consideration of additional criteria. *See Jackson*, 369 Md. at 600.  The federal courts are in accord. *Alberto N. v. Hawkins*, No. 6:99-CV-459, 2007 WL 8429756, at *7 (E.D. Tex. June 8, 2007) ("Every Circuit addressing the reach of this provision has held that state Medicaid agencies do not have the discretion to deny medical services to beneficiaries under the age of twenty-one if those services are necessary to correct or ameliorate a beneficiary's medical condition.").

---

[20] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland.  The name change took effect on December 14, 2022.

21

In *Jackson*, the Supreme Court of Maryland examined the federal requirements for EPSDT programs. In that case, two EPSDT recipients requested preauthorization for life-saving liver transplant surgeries. *Jackson*, 369 Md. at 579. One of the recipients, Jackson, had received two prior liver transplants, the first of which failed and the second of which his body rejected. *Id.* at 582. After the second transplant he was placed in foster care and was not always given his medication, which contributed to the rejection of the liver. *Id.* at 582–83. The Department denied preauthorization for a third transplant, stating that "'a third transplant was not necessary or appropriate for preapproval for reimbursement' because [Jackson] 'remains at great risk for future transplant failure.'" *Id.* at 583. The second recipient, Nettles, was initially granted preauthorization for a liver transplant, but no matching liver became available during the 60-day preauthorization period. *Id.* When she sought recertification for the preauthorization, "the Department requested supplemental information regarding [Nettles'] other diagnosed medical problems and how they would affect her liver transplantation surgery and chances of recovery." *Id.* Nettles' primary health care provider submitted the requested information "and stated that the other diseases would not affect [Nettles'] chances of a successful liver transplantation." *Id.* The Department nonetheless denied recertification, "stating that, because it could not predict how [Nettles'] other diseases would affect the liver transplantation surgery, it considered the 'liver transplant in [Nettles'] situation experimental.'" *Id.* at 584. In both cases, the children's primary care provider performed the surgeries at its own expense, believing the surgeries to be necessary to save the children's lives. *Id.* at 583–84. Jackson's surgery was successful; however, Nettles died of liver failure over a year after the surgery. *Id.*

Jackson and the personal representative of the estate of Nettles filed a complaint seeking an injunction preventing the Department from using the "appropriateness" requirement when considering preauthorization of services for children. *Id.* at 584–85.

Our Supreme Court noted that 42 U.S.C. § 1396d(r)(5) requires states to provide as part of Medicaid EPSDT services "such other *necessary* . . . treatment . . . to correct or ameliorate . . . conditions discovered by screening services." *Id.* at 596–97 (alterations in original). At the time *Jackson* was decided, a Maryland EPSDT regulation provided:

> The Department will preauthorize services when the provider submits to the Department or its designee adequate documentation demonstrating that the service to be preauthorized is necessary and appropriate. "Necessary" means directly related to diagnostic, preventative, curative, palliative, or rehabilitative treatment. "Appropriate" means an effective service that can be provided, taking into consideration the particular circumstances of the recipient and the relative cost of any alternative services which could be used for the same purpose.

*Id.* at 579 n.2. The Court held that the Department may not add criteria beyond medical necessity for EPSDT services:

> As the Court has stated, once Maryland elected to participate in the federal Medicaid program, it agreed to comply with all mandates provided in the federal Medicaid Act and other related provisions. The federal requirement most relevant to this appeal is that participating states are required to administer periodic medical screenings to persons under 21, and to provide medically necessary treatment for such ailments and conditions that are discovered during those screenings. The federal program makes no mention of utilizing an "appropriateness" analysis in determining whether a [M]edicaid-eligible child should receive medically necessary treatments provided through EPSDT services. Nevertheless, the Maryland [M]edicaid provision regarding preauthorization of services . . . requires that medically necessary treatment for a [M]edicaid-eligible child must also be "appropriate," which is beyond the dictates of federal law. The federal guidelines allow states no discretion to use an "appropriateness" test in deciding whether a person under 21 can receive medically necessary treatment. *Therefore, because the provision imposes additional criteria upon*

*qualified recipients, which illegally denies services to those who would normally receive medically necessary treatment, we agree with the plaintiffs that [the preauthorization provision] is partially invalid under federal law.*

*Id.* at 600 (emphasis added).

Several federal district courts have applied similar reasoning concerning limitations on EPSDT PDN services. Recently, the United States District Court for the Northern District of Georgia considered whether the state's "teach and wean" policy, whereby caregivers are taught skilled nursing procedures and then PDN hours are reduced on the assumption that caregivers have mastered those skills, complied with the federal Medicaid Act's EPSDT requirements. *M.H. v. Berry*, No. 1:15-CV-1427-TWT, 2021 WL 1192938, at *6 (N.D. Ga. March 29, 2021). The court concluded that Georgia's "decision to reduce the skilled nursing hours [was] not based on medical necessity but arbitrarily shifted more of the burden of a child's care to the caregiver without any consideration of [the] caregiver's capacity to provide the care." *Id.* Instead,

> *the determination of whether private nursing services are medically necessary should be based on whether a service is medically necessary to correct or ameliorate a beneficiary's condition, not on whether or not the caregiver is able to provide those skills.* The Medicaid Act requires [that] private duty nursing services be provided by licensed nurses. It does not provide for the delegation of activities which require the knowledge and skill of a licensed nurse.

*Id.* at *7 (emphasis added).

Similarly, the United States District Court for the Eastern District of Texas considered whether the Texas EPSDT program's policy limiting PDN services based on a requirement that parents provide skilled nursing care to their children was in compliance with the federal EPSDT requirements. *Alberto N. v. Hawkins*, No. 6:99-CV-459, 2007 WL

24

8429756 (E.D. Tex. June 8, 2007). That court considered both the "necessary" language from 42 U.S.C. § 1396d(r)(5), and the federal requirement that PDN services be provided by an RN or LPN from 42 C.F.R. § 440.80, and concluded:

> [A] determination of whether private duty nursing services are medically necessary should not include whether or not the caregiver, or an alternate caregiver, or a friend or a neighbor, is able to provide those skills. *The issue is whether a service is medically necessary to correct or ameliorate a beneficiary's condition.* Nothing in the Medicaid Act or its implementing regulations allows states to avoid their obligation to provide medically necessary services to EPSDT beneficiaries based upon non-medical criteria, such as the ability of the primary caregiver to provide medical services themselves, or medical criteria that does not track the Medicaid Act's "correct and ameliorate" standard.
>
> . . .
>
> . . . [W]hen a child has a chronic condition that requires "more individual and continuous care" by a licensed nurse, a parent should not be called upon to "fill the gap" and provide necessary medical services based on what they can or cannot be trained to do. A child's medical need, and that child's need for medically necessary services, does not change simply because a caregiver acquires some training. By employing a standard outside the "correct and ameliorate" standard established by the Medicaid Act, Texas Medicaid renders Plaintiffs' entitlement to all medically necessary services meaningless.

*Id.* at \*13 (emphasis added) (citations omitted).

The caselaw is clear that the denial of EPSDT services may only be based on lack of medical necessity, and not on any additional criteria. *Jackson*, 369 Md. at 600. The federal cases hold that limitations on PDN based on the presence of caregivers able to provide skilled nursing care is an additional criterion beyond what is medically necessary for the participant. *M.H.*, 2021 WL 1192938, at \*7; *Alberto N.*, 2007 WL 8429756, at \*13. Similarly, we reject the Department's attempt to incorporate COMAR 10.09.53.05B into

25

the REM program as a limitation on covered services because that interpretation substantially ignores what is medically necessary for the participant's care. To that extent, the Department's interpretation invalidly adds criteria that effectively "denies services to those who would normally receive medically necessary treatment." *Jackson*, 369 Md. at 600. We will not adopt an interpretation of a regulation that would render it invalid. *See Hill v. Baltimore County*, 86 Md. App. 642, 651–52 (1991) ("When confronted with two proposed interpretations—one rendering legislation valid and the other invalid—courts generally attempt to read the enactment in a manner to render it valid."). Moreover, our interpretation is consistent with the principle that "remedial statutes are to be construed 'liberally' in favor of claimants." *Cathey*, 422 Md. at 605.

As discussed above, the parties do not dispute that Ms. Sulerzyski requires 24/7 PDN-level care. Because the Department must provide medically necessary care under REM (and under EPSDT for participants under age 21), subject to the requirement that the participant have a caregiver and certain other requirements not at issue in this appeal, the ALJ erred in ruling as a matter of law that PDN is only available during the times listed in COMAR 10.09.53.05B.[21]

Finally, we address the ALJ's finding that Ms. Sulerzyski does not have a caregiver as required by COMAR 10.09.69.11A(4)'s incorporation of 10.09.53.04A(10) ("Participant has at least one caregiver willing and able to accept responsibility for the

---

[21] The Department argues that it may "specify the amount, duration, and scope" of PDN services pursuant to 42 C.F.R. § 440.230(a). We reject the Department's assertion that 42 C.F.R. § 440.230(a) authorizes the Department to curtail medically necessary PDN services based on the caregiver's work, school, or sleep schedule.

participant's care when the nurse . . . is not available"). Mother's affidavit clearly indicates that Ms. Sulerzyski has at least one caregiver available, stating: "Abigail's aunt, Donna Abramczyk, has agreed to be a willing and able caregiver when nursing services are unavailable." Furthermore, viewing the evidence in the light most favorable to Ms. Sulerzyski, the ALJ clearly erred in finding that Ms. Sulerzyski's "parents/guardians are unavailable to act as caregivers" where the only evidence before the ALJ concerning the parents' availability was Mother's affidavit, where she stated:

17. I am Abigail's mother and legal guardian. I work full-time and have a medical condition that limits my ability to be an alert and awake caregiver.

18. Abigail's father and legal guardian, David Sulerzyski, works full-time and is on call on weekends.

The affidavit also indicated that the parents had been acting as Ms. Sulerzyski's caregivers on weekends. Moreover, that Ms. Sulerzyski had been receiving 137 hours of PDN services per week for some period of time before her request for 24/7 PDN services leads us to infer that she has had a caregiver acceptable to the Department. Viewed in a light most favorable to Ms. Sulerzyski as the non-moving party, Ms. Sulerzyski produced sufficient evidence for purposes of summary decision that she has a "caregiver" as contemplated by 10.09.53.04A(10). The ALJ erred in concluding otherwise.

For the reasons stated, we affirm the circuit court's vacation of the ALJ's summary decision in favor of the Department, and remand to the OAH for further proceedings

consistent with this opinion.[22]

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. CASE REMANDED TO THE OFFICE OF ADMINISTRATIVE HEARINGS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**

---

[22] Ms. Sulerzyski also argues that requiring her to have a caregiver violates the Americans with Disabilities Act ("ADA") because it would prevent her from living in the "most integrated setting" appropriate to her needs. *See* 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."). Ms. Sulerzyski relies upon *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), to support this argument. *Olmstead* concerned the placement of intellectually and mentally disabled individuals in institutions rather than community settings. *Id.* at 587. The Supreme Court held that an individual must be placed in a community setting when "community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* This summary decision record is clearly insufficient to permit the ALJ (or this Court) to make any determination as to the factors enumerated in *Olmstead*.